Kathleen L. Wieneke, Bar #011139
Christina Retts, Bar #023798
Nicholas D. Acedo, Bar #021644
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
Telephone: (602) 263-1700
Fax: (602) 200-7858
kwieneke@jshfirm.com
cretts@jshfirm.com
nacedo@jshfirm.com

Attorneys for Defendants City of Phoenix, Harris, Orona, Buckner, Gray, Garcia, and Clark

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Chara Watson-Nance and Lia Shackelford, the natural children of Doris Virginia Watson; and the Estate of Doris Virginia Watson,<br><br>Plaintiffs,<br><br>v.<br><br>City of Phoenix, a public entity; City of Phoenix Police Department; Chief Jack Harris and Jane Doe Harris, husband and wife; Steve Orona and Jane Doe Orona, husband and wife; John Buckner and Jane Doe Buckner, husband and wife; Brian Gray and Jane Doe Gray, husband and wife; Kelli Garcia and John Doe Garcia, husband and wife; Theresa Clark and John Doe Clark, husband and wife; John Doe Officers I-X; Jane Doe Officers I-X; John Doe Supervisors I-X; Jane Doe Supervisors I-X; John Does I-X; Jane Does I-X,<br><br>Defendants. | NO. CV-08-1129-PHX-ROS<br><br>**DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Local Rule of Civil Procedure 56.1(a), Defendants City of Phoenix, Jack Harris, John Buckner, Brian Gray, and Kelli Garcia ("Defendants") submit this Statement of Facts in support of their Motion for Summary Judgment.

2267629.1

1. Doris Watson had been suffering from a schizoaffective bipolar disorder for approximately 20 years, and had many psychotic episodes. (Deposition of Chara Watson-Nance, attached as Ex. A, at 44–45, 53–59, 61–89; Doris Watson Medical Records Excerpts, attached as Ex. B.)

2. During these episodes, Watson would often become violent and combative with police, paramedics, and care facility employees. (Ex. A at 53–57; Ex. B; Deposition of Cynthia Geldreich, attached as Ex. C, at 28–29.)

3. Watson tried killing her husband in 1992 during one of these episodes. (Ex. A at 53–57.)

4. Watson also attempted suicide several times. (Ex. A at 47–48, 57, 88–89.)

5. In 2007, Watson was a ValueOptions patient. (Ex. A at 73.)

6. On March 13, 2007, she was 69-years-old. (Autopsy Report, attached as Ex. D.)

7. On March 13, 2007, at approximately 1:00 a.m., cab driver Thomas Brown was dispatched to Phoenix Baptist Hospital. (Deposition of Thomas Brown, attached as Ex. E, at 6, 22–23.)

8. When he arrived, he saw Watson "fighting with" eight or nine hospital employees. (Ex. E at 7–8; Deposition of Fred Soqui, attached as Ex. F, at 9–11.)

9. Watson had apparently admitted herself for an asthma attack, and was then discharged. (Ex. A at 90.)

10. They were trying to retrieve a clipboard she had taken and refused to give back. (Ex. E at 7–8; Ex. F at 9–11.)

11. Watson was "combative" and "throwing elbows." (Ex. E at 7; Ex. F at 14, 17.)

12. The employees eventually secured the clipboard, and escorted Watson into Brown's cab. (Ex. E at 8–9.)

1         13.    As he drove to Watson's apartment, she became even more agitated, and started "pounding [Brown] on [his] shoulder" with her fist, telling him that he "better take her home or she's going to sue [him] personally." (Ex. E at 9–11.)

        14.    As Brown continued driving, Watson reached forward and pulled Brown's hair "hard," and demanded that he take her home. (Ex. E at 14–16.)

        15.    When Brown arrived at the address he had been given, Watson told him that she did not live there. (Ex. E at 14.)

        16.    Brown pulled over, and called police. (Ex. E at 14.)

        17.    When Officers approached Watson and asked for her proper address, Watson started fighting with them, kicking one of the officers in the face. (Ex. E at 16–17.)

        18.    Watson struggled with police for approximately 10 minutes, but, eventually, the officers were able to get her purse and found an alternate address. (Ex. E at 16–18.)

        19.    Brown agreed to take her to the new address, which was only a block away. (Ex. E at 16–18.)

        20.    Watson continued yelling at Brown, and, at one point, she reached forward, grabbed Brown's ear, and "pulled it hard." (Ex. E at 18–19.)

        21.    She also threatened to "kick the hell out of" him. (Ex. E at 23.)

        22.    When they arrived, Watson refused to get out of the cab. (Ex. E at 19–20.)

        23.    Police called Watson's daughter, Chara, who arrived shortly after, and was able to coax her out of the cab. (Ex. A at 100–106; Ex. E at 19–20.)

        24.    Chara took Watson to her apartment, and contacted the ValueOptions crisis team. (Ex. A at 112.)

        25.    Chara believed that Watson had stopped taking her medications for at least a week. (Ex. A at 112, 114–115.)

2267629.1       3

26. The crisis team arrived at approximately 4:00 a.m., evaluated Watson, and recommended that she be taken to the emergency room, but Chara elected to keep Watson at home.. (Ex. A at 118–121).

27. Several hours later, at about 7:00 a.m., Watson's ValueOptions case manager called to follow up on Watson's condition, and scheduled an appointment with a psychiatrist later that morning. (Ex. A at 121–124.)

28. At approximately 10:30 a.m., Watson's temperament began to escalate, and when Chara tried to help her get dressed, Watson became confrontational and violent. (Ex. A at 124–130; Chara Watson-Nance PSB Interview, attached as Ex. H, at 56–62.)

29. Watson assumed a "karate stance" and began wielding a glass cup. (Ex. A at 124–130; Ex. H at 56–62.)

30. Watson then grabbed Chara's car keys, and insisted that she was going to drive. (Ex. A at 124–130; Ex. H at 56–62.)

31. A struggle for the keys then ensued, causing them both to fall to the ground. (Ex. A at 124–130; Ex. H at 56–62.)

32. Watson ran out of the apartment into the corridor and began screaming "rape." (Ex. A at 130–131; Deposition of Kathleen Czekaj, attached as Ex. I, at 20, 23.)

33. Watson still had the glass in her hand, and appeared ready to "throw it" or "bash" someone with it. (Ex. I at 20–21; Kathleen Czekaj PSB Interview, attached as Ex. J, at 10–11, 15.)

34. Watson eventually made her way into the parking lot, and into the driver's seat of Chara's car. (Ex. A at 131–132.)

35. Chara asked Watson to get out of the car, but Watson refused and insisted that she was going to drive. (Ex. A at 131–132.)

36. When Chara reached into the car to lure her mother out, Watson grabbed onto Chara's hair with both hands and would not let go. (Ex. A at 131–134.)

37. Chara struggled with Watson in this position for about 5 to 10 minutes, and eventually broke free, but not before Watson pulled out two "handfuls" of Chara's hair, struck Chara's head and eye, and broke Chara's glasses. (Ex. A at 133–134, 148–151; Chara Watson-Nance Interview With Officer Buckner, attached as Ex. G, at 3–4; Ex. H at 60–61, 120; Deposition of Monica Mendez, attached as Ex. K, at 11–16, 19–20.)

38. Chara retreated to the curb, and called 911. (Ex. A at 137–140, 145–148; 911 transcript Excerpts, attached as Ex. L.)

39. Chara also contacted ValueOptions, who said they would dispatch a crisis team. (Ex. L at 15, 18.)

40. Officers Buckner, Gray, and Garcia simultaneously arrived on the scene. (Deposition of John Buckner, attached as Ex. M, at 11–13; Deposition of Brian Gray, attached as Ex. N, at 25; Deposition of Kelli Garcia, attached as Ex. O, at 13.)

41. To their knowledge, they were responding to an "assault in progress, domestic violence" call involving a mother and a daughter, and had been informed that "the mother was hitting the daughter with a glass." (Ex. M at 7, 9–10; Ex. N at 12–13; Ex. O at 7–8, 14.)

42. Officers Buckner and Gray were told that the mother was a ValueOptions patient. (Ex. M at 10; Ex. N at 18; Ex. O at 17–18.)

43. When they arrived, Watson was still sitting in the driver's seat of Chara's car with the door open. (Ex. M at 15–16; Ex. N at 26–27, 33.)

44. Her "fists were clinched and her face looked of rage, eyes were wide, wide open." (Ex. M at 16.)

45. Officer Gray approached the car, announced himself, and asked Watson "what was going on." (Ex. N at 33, 35–36.)

46. Watson raised her clinched fists, and responded, "You raped me" and "[A]ll police should die." (Ex. N at 34–36, 167.)

47. As Officer Gray got to about 3 feet away, Watson "lunged out of the car towards [him]," and continued walking right past him and towards his patrol car. (Ex. K at 51; Ex. M at 19–20; Ex. N at 34–35, 37, 45.)

48. Officer Gray's patrol car was unlocked, and the keys were in the ignition. (Ex. N at 45, 47.)

49. Officer Gray turned and followed Watson, but Watson ignored him, continued walking, and grabbed the patrol car's door handle with her right hand. (Ex. N at 45–47.)

50. Concerned for everyone's safety, Officer Gray grabbed her wrist and pulled it away from the car. (Ex. N at 47–48.)

51. When he did, Watson "spun around and tried to punch" Officer Gray, and began kicking, biting, and pulling away. (Ex. K at 32–33, 52; Ex. M at 21; Ex. N at 47–49; Ex. O at 33.)

52. Officer Buckner came to assist and took hold of Watson's left arm, but Watson continued to bite and kick at the officers. (Ex. M at 21–22; Ex. N at 49; Ex. O at 30, 32.)

53. Officer Buckner repeatedly instructed Watson to "calm down," but she refused, and screamed out, "Kill the police. Kill the police. They're raping me." (Ex. K at 33; Ex. M at 22–24.)

54. Watson also ignored the officers' commands to submit, and continued to fight them. (Ex. K at 33, 35–36, 54–55.)

55. At one point, Officer Gray lost his grip, and Watson went down to the ground onto her buttocks. (Ex. M at 24–28; Ex. N at 49–51, 61.)

56. Once on the ground, Watson "rolled back, pulled her knees up to her chest and began kicking at" Officer Gray, striking him. (Ex. M at 28; Ex. N at 52.)

57. Officer Gray managed to grab a hold of Watson's right arm again, and the two officers rolled her onto her stomach in order to handcuff her. (Ex. M at 28–29; Ex. N at 53–54.)

58. Watson continued to resist, trying to lift up, roll over, and pull her left arm underneath her. (Ex. K at 34–36; Ex. M at 29–31, 36–37, 43–44; Ex. N at 55–61; Ex. O at 39.)

59. Officer Buckner placed one hand on the back of Watson's head, his left knee on the ground, and his right knee on Watson's right shoulder blade, applying just enough pressure to prevent her from rolling over. (Ex. K at 34–36; Ex. M at 29–31, 36–37, 43–44; Ex. N at 55–61; Ex. O at 39.)

60. Once Officer Gray was able to handcuff Watson's right hand, Officer Buckner removed his knee so that they could handcuff her left hand. (Ex. K at 34–36; Ex. M at 29–31, 36–37, 43–44; Ex. N at 55–61; Ex. O at 39.)

61. He did not place his knee on her back again. (Ex. K at 34–36; Ex. M at 29–31, 36–37, 43–44; Ex. N at 55–61; Ex. O at 39.)

62. Officer Gray did not make any further contact with Watson after she was handcuffed. (Ex. N at 83.)

63. Once she was cuffed, he stepped away and called the fire department to seek medical attention for Watson. (Ex. N at 79–80.)

64. Watson continued to struggle and attempted to get up even after she was handcuffed. (Ex. M at 38–39, 44; Ex. N at 89, 91–92.)

65. She continued screaming, "flailing around," "[k]icking her legs, trying to roll over, [and] canting her body." (Ex. M at 38–39, 44; Ex. N at 89, 91–92.)

66. To maintain control of Watson—i.e., prevent her from rolling over, getting up, and assaulting anyone else—Officer Buckner kept one hand on the back of Watson's head and another on the middle of her back, with just enough pressure to keep her from raising her head or rolling over. (Ex. M at 38–40; Ex. N at 85–92; Ex. O at 42–45.)

67. Officer Garcia, who had been tending to Chara, assisted Officer Buckner and held Watson's ankles with her hands to stop her kicking until ankle restraints could be fastened. (Ex. M at 48–49; Ex. O at 39–40, 45, 49–50.)

1         68.      While Officer Buckner applied the ankle restraints, Watson continued
2 to move around so Officer Garcia placed her hand on Watson's back with only enough
3 pressure to keep her from moving. (Ex. M at 49; Ex. O at 54–55.)
4         69.      Officer Buckner then resumed his original position after securing her
5 legs and placed his hands in the same manner until the fire department arrived. (Ex. M at
6 40, 49–51; Ex. O at 60–61.)
7         70.      Officer Garcia stood by. (Ex. O at 61.)
8         71.      Once the ankle restraints were applied, Watson stopped resisting, but
9 continued jostling around. (Ex. K at 70–72; Ex. M at 50, 61; Ex. O at 53.)
10         72.      Once the leg restraints were secured, Watson rolled on to her right
11 side and canted her left knee up. (Ex. H at 105; Ex. M at 46.)
12         73.      A towel was placed under Watson's head to keep it off the pavement.
13 (Ex. M at 51; Ex. N at 96; Ex. O at 50–52.)
14         74.      The fire department arrived shortly thereafter. (Ex. M at 61.)
15         75.      During this time, Officers Buckner and Gray monitored Watson's
16 breathing. (Ex. M at 56, 67, 115; Ex. N at 102; Ex. O at 63–66.)
17         76.      Officer Buckner could feel the rise and fall of her back with his hand,
18 and, at one point, Officer Gray took Watson's pulse to ensure that she was breathing, and
19 was able to find a pulse. (Ex. M at 56, 67, 115; Ex. N at 79, 102; Ex. O at 63–66.)
20         77.      Watson intermittently made noises, and Officer Gray noticed her
21 moving. (Ex. N at 78–79; Ex. O at 53.)
22         78.      Just as fire department personnel arrived, however, Officer Buckner
23 heard Watson give a "deep sigh" and then nothing else. (Ex. M at 65–68.)
24         79.      He checked her pulse and could not find one. (Ex. M at 65–68.)
25         80.      The officers removed Watson's restraints and began cardiopulmonary
26 resuscitation ("CPR"). They also helped retrieve equipment from the ambulance. (Ex. M
27 at 69–70, 73–74; Ex. N at 118.)
28

1          81.     Paramedics on the scene took over the life-saving efforts and transported her to the hospital. (Deposition of Kellie Bowers, attached as Ex. P, at 63, 69–70.) The ValueOptions crisis team never arrived. (Ex. O at 134.)

           82.     Those efforts were unsuccessful, and Watson later died. (Ex. D.)

           83.     The medical examiner concluded that the cause of death was pre-existing coronary artery disease. (Deposition of John Hu, attached as Ex. Q, at 9–11, 15, 17.)

           84.     Three of Watson's coronary arteries had substantial blockage—75%, 50%, and 40%—which was exacerbated by her hypertension and high blood pressure. (Ex. A at 109; Ex. Q at 15, 25, 27.)

           85.     "Acute psychotic episode with physical exertion and confrontation with others" was listed as a contributing factor. (Ex. Q at 17–18.)

           86.     Chara and her sister, Lia Shackelford, ("Plaintiffs") filed the instant lawsuit on March 12, 2008. (Complaint, attached as Ex. R.)

           87.     Plaintiffs raised both state and federal claims against the City of Phoenix, Officers Buckner, Gray, and Garcia, and Chief Jack Harris. (Ex. R.)

           88.     The complaint also named the City of Phoenix Police Department, Detective Steve Orona, and Sergeant Theresa Clark as defendants, but the Phoenix Police Department was dismissed by order of this Court as a non-jural entity, and Orona and Clark were dismissed by stipulation of the parties. (Ex. R; Dkt. ## 23, 79, 80).

           89.     Plaintiffs' state claims include negligence, gross negligence, intentional infliction of emotional distress, false imprisonment, false arrest, and a violation of A.R.S. § 46–451, *et seq.*, the Adult Protective Services Act ("APSA"). (Ex. R.)

           90.     The complaint also included a state claim for negligent infliction of emotional distress, but that claim was previously dismissed by this Court. (Ex. R; Dkt. # 23.)

91. Plaintiffs' federal claims include excessive force, deliberate indifference to medical needs, unlawful detention, and violation of the right to familial association, in violation of the Fourth, Eighth, and Fourteenth Amendments. (Ex. R.)

92. The federal claims also allege municipal and supervisorial liability against the City and Chief Harris. (Ex. R.)

93. In Count 4, Plaintiffs allege that the officers used excessive force against Watson by "grabbing her arms, taking her to the concrete ground, forcing her to lie face-down on her stomach, cuffing her arms behind her back, shackling her legs, pressing their knees, hands, and weight into her while doing so." (Ex. R, ¶¶ 60, 117.)

94. Chara, Watson's apartment manager, and other bystanders were nearby during the incident. (Ex. K at 28; Ex. M at 63; Ex. N at 63; Ex. O at 66.)

95. When Watson initially stormed out of her apartment wielding the glass, another neighbor had been walking by with her two grandchildren. (Ex. I at 7–9, 12, 20–21.)

96. The officers believed it was necessary to keep a hand on Watson's back until the fire department arrived to prevent her from getting up, hurting herself, and/or hurting any one else. (Ex. M at 46, 74; Ex. N at 85, 91.)

97. In Count 4, Plaintiffs further allege that the officers were deliberately indifferent to Watson's medical needs when they "failed to notice" that Watson had stopped breathing and took "no steps to attempt to revive" her. (Ex. R, ¶¶ 61, 117.)

98. After Watson was transported to the hospital, Officer Buckner continued with the domestic violence investigation, and interviewed Chara at the apartment complex. (Ex. G; Ex. M at 80–81.)

99. Chara testified at her deposition that she had tried to get into the ambulance to ride to the hospital with Watson, but that Officer Buckner "placed a hand on [her] arm" and told her that she needed to stay and be interviewed. (Ex. A at 169–171.)

100. Count 5 of the complaint alleges that this detainment was unlawful under the Fourth Amendment. (Ex. R, ¶ 124.)

2267629.1                                              10

101. The complaint also asserts as a basis for her claim that Chara was forced to give a second interview at the hospital and was prevented from leaving. (Ex. R, ¶ 124.)

102. That interview was conducted by Detective Steve Orona and Sergeant Theresa Clark as part of their Professional Standards Bureau's investigation. (Ex. H at 1.)

103. Upon arriving at the scene, Chara appeared to be one of the individuals involved in the domestic violence call based on her proximity and appearance—she was sitting on the curb crying, and looked "wore out" and "injured," "like someone that's been through a battle." (Ex. M at 78, 82–83; Ex. O at 13–15, 24.)

104. The officers also observed blood on Watson's mouth, nose, and hands, and believed that Watson was both a suspect and a victim. (Ex. M at 59–60; Ex. N at 40–42, 149.)

105. In fact, one witness saw Chara striking Watson in the car. (Deposition of Sharon Conner, attached as Ex. S, at 10, 13.)

106. The officers did not handcuff Chara, they did not place her in the back of a patrol car, and they did not take her into custody; they simply asked her several pointed questions relating to the event, particularly what had transpired, and then escorted her to the hospital. (Ex. G; Ex. M at 81–84; Ex. O at 85.)

107. Throughout the complaint, Plaintiffs allege that Defendants' actions also violated their right to familial association. (Ex. R, ¶¶ 113, 121.)

108. To the extent that it can be gleaned from the complaint, Plaintiffs raise two claims against the City in Count 3: (1) implementing policies that condone an indifference to medical conditions, the use of excessive force, and improper restraint; and (2) failure to adequately train its officers regarding the use of force, providing medical care, and restraining individuals. (Ex. R, ¶¶ 100–114.)

109. Plaintiffs specifically allege in their complaint that the City did have policies requiring the use of only reasonable force, to ensure prompt medical treatment,

and to restrain mentally disturbed individuals with caution, and that officers were trained in these areas. (Ex. R, ¶¶ 62–68.)

110. Plaintiffs further allege in Count 3 that Chief Harris is liable in both his individual and official capacity for the City's policies and training regarding use of force, medical care, and restraining citizens simply because he is a "policy maker" and "ultimately responsible for everything that happens in the City's Police." (Ex. R, ¶¶ 101–104.)

111. Counts 1 (negligence) and 2 (gross negligence) allege that the individual officers negligently caused Watson's death by using excessive force, and by failing to provide proper medical care (failing to monitor her medical condition and attempt to revive her). (Ex. R, ¶¶ 72–99.)

112. They further allege that the City of Phoenix and Chief Harris negligently trained and supervised the officers, and negligently implemented and/or ratified certain policies relating to the officers' use of force and medical care. (Ex. R, ¶¶ 72–99.)

113. In Count 6 of the complaint, Plaintiff Chara alleges that she suffered emotional distress as a result of Defendants' use of force against Watson in her presence, preventing her from accompanying Watson to the hospital, and detaining her for questioning after Watson had died. (Ex. R, ¶ 130.)

114. Plaintiffs Chara and Lia further allege in Count 6 that they suffered emotional distress as a result of not being allowed to spend time alone with Watson in the hospital room after she died. (Ex. R, ¶ 130.)

115. Both Chara and Lia testified that a police officer was in Watson's hospital room at all times. (Ex. A at 174; Ex. O at 91–94; Deposition of Lia Shackelford, attached as Ex. T, at 86.)

116. Lia testified that she told the officer that she was going to give Watson a kiss, that the officer told her not to, and that when she proceeded to kiss her the officer pulled her back. (Ex. T at 86–88.)

117. Since Watson was still a suspect (and possibly a victim) in an ongoing investigation, an officer was present with her body to ensure that it was properly preserved and not tampered with. (Ex. O at 91–94.)

118. In Count 7, Plaintiffs allege that Defendants violated the Adult Protective Services Act ("APSA") because they "had a legal duty to protect and provide care" to Watson and negligently caused her death. (Ex. R, ¶¶ 138–139.)

119. Plaintiffs request punitive damages in connection with their federal constitutional and state tort claims. (Ex. R, ¶¶ 84, 99, 114, 122.)

120. This Court has already dismissed Plaintiffs' claim for punitive damages under APSA. (Dkt. # 23 at 13.)

RESPECTFULLY SUBMITTED this 6th day of July, 2010.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ Nicholas D. Acedo
Kathleen L. Wieneke
Christina Retts
Nicholas D. Acedo
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
Attorneys for Defendants City of Phoenix, Harris, Orona, Buckner, Gray, Garcia, and Clark

2267629.1                              13

...

# CERTIFICATE OF SERVICE

☒ I hereby certify that on August 6, 2010, I electronically transmitted the attached document to the Clerk's Office using CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

>Michael C. Manning
>Leslie E. O'Hara
>Stinson Morrison Hecker LLP
>1850 North Central Avenue, Suite 2100
>Phoenix, Arizona  85004
>mmanning@stinson.com
>*Attorneys for Plaintiffs*

 /s/  Ginger Stahly

2267629.1                                    14