1   Michael C. Manning (#016255)
    Leslie E. O'Hara (#005923)
2   **STINSON MORRISON HECKER** LLP
    1850 North Central Avenue, Suite 2100
3   Phoenix, Arizona 85004-4584
    (602) 279-1600
4   Fax: (602) 240-6925
    Email:  mmanning@stinson.com
5   Attorneys for Plaintiffs

6

7               **UNITED STATES DISTRICT COURT**

                    **DISTRICT OF ARIZONA**
8

9   CHARA WATSON-NANCE and LIA          )    No. CV-08-1129-PHX-ROS
    SHACKELFORD, the natural children   )
    of Doris Virginia Watson; and the   )    **PLAINTIFFS' SEPARATE**
10  ESTATE OF DORIS VIRGINIA            )    **CONTROVERTING AND**
    WATSON,                             )    **SUPPLEMENTAL STATEMENT OF**
11                                       )    **FACTS IN SUPPORT OF**
                                        )    **OPPOSITION TO DEFENDANTS'**
                Plaintiff(s),           )    **MOTION FOR SUMMARY**
12                                       )    **JUDGMENT**
    v.                                  )
13                                       )
    CITY OF PHOENIX, a public entity;   )
14  CITY OF PHOENIX POLICE             )
    DEPARTMENT; CHIEF JACK              )    (Assigned to the Honorable Roslyn O.
15  HARRIS and JANE DOE HARRIS,        )    Silver)
    husband and wife; STEVE ORONA      )
16  and JANE DOE ORONA, husband and    )
    wife; JOHN BUCKNER and JANE        )
17  DOE BUCKNER, husband and wife;     )    (Oral Argument Requested)
    BRIAN GRAY and JANE DOE            )
18  GRAY, husband and wife; KELLI      )
    GARCIA and JOHN DOE GARCIA,        )
19  husband and wife; THERESA CLARK    )
    and JOHN DOE CLARK, husband and    )
20  wife; JOHN DOE OFFICERS I-X;       )
    JANE DOE OFFICERS I-X; JOHN        )
21  DOE SUPERVISORS I-X; JANE          )
    DOE SUPERVISORS I-X; JOHN          )
22  DOES I-X; JANE DOES I-X,           )
                                        )
23              Defendant(s).           )

24

25          Pursuant to Ariz. R. Civ. P. 56 (c)(2), Plaintiffs, Chara Watson-Nance and Lia

26  Shackelford, the natural children of Doris Virginia Watson, and the Estate of Doris

Virginia Watson (collectively "Plaintiffs"), through their undersigned counsel, submit this Separate Controverting and Supplemental Statement of Facts in Support of their Opposition to Defendants' Motion for Summary Judgment ("CSSOF").

For ease of reference, Plaintiff has replicated Defendants' Statement of Facts ("DSOF") and then provided Plaintiff's controverted facts in bold type.  Plaintiff's Supplemental Statement of Facts follow .

**For purposes of responding to this Motion for Summary Judgment, Plaintiffs respond to DSOF as follows:**

**<u>CONTROVERTING STATEMENT OF FACTS</u>**

1.      Doris Watson had been suffering from a schizoaffective bipolar disorder for approximately 20 years, and had many psychotic episodes. (Deposition of Chara Watson-Nance, attached as Ex. A, at 44–45, 53–59, 6 1–89; Doris Watson Medical Records Excerpts, attached as Ex. B.)

**DISPUTED:  Plaintiffs dispute DSOF #1 in that the cited testimony does not support the statement of fact.  Chara Watson-Nance ("Chara") was read excerpts of medical records of which she had no knowledge.  Plaintiffs object to the excerpts of medical records contained in Ex. B on the basis that the records, dating back as far as 1989, contain hearsay and are irrelevant and immaterial to the litigation for any purpose, including (without limitation) resolution of this Motion.  In many instances, the records are incomplete and author of the records is unknown.  Plaintiffs object to the diagnosis "schizoaffective bipolar disorder" in that the medical records contained in Ex. B indicate varying diagnoses of Doris Watson's ("Doris") mental disorder.  Plaintiffs also object to the term "psychotic" which suggests a medical diagnosis and is not supported.**

**For purposes of this Motion only, Plaintiffs do not dispute that Doris suffered from mental illness during the last twenty years of her life for which she was medicated, but at times, required her to be hospitalized.  [Deposition of Lia**

2

Shackelford, ("Lia depo.") at 42:10-43:7, attached hereto as Exh. 21; Deposition of Chara Watson-Nance ("Chara depo.") at 45:25-46:9, attached as Exhibit 9; Deposition of Alvin Burstein, M.D. ("Burstein depo.") at 77:9-78:14; 147:11-150:1, attached as hereto as Exhibit 33]

2.     During these episodes, Watson would often become violent and combative with police, paramedics, and care facility employees. (Ex. A at 53–57; Ex. B; Deposition of Cynthia Geldreich, attached as Ex. C, at 2 8–29.)

DISPUTED: Plaintiffs dispute DSOF # 2 for all the reasons set forth in their response to DSOF # 1, *supra*.

Additionally, the cited testimony of Cynthia Geldrich is misleading.  Ms. Geldrich did not remember what was meant by the use of the word "combative" and was not the author of the second referenced note describing Doris as combative.  Furthermore, Ms. Geldrich lacked personal knowledge as she had been Doris' case manager for less than 3 months prior to her death. [Deposition of Cynthia Geldrich, ("Geldrich depo.") at 11:20-12:1, attached hereto as Exhibit 36]

3.     Watson tried killing her husband in 1992 during one of these episodes. (Ex. A at 53–57.)

DISPUTED: Plaintiffs dispute DSOF #3 in that the cited testimony does not support the statement of fact.  Chara was read an excerpt of a medical record of which she had no knowledge.  Moreover, the facts and circumstances of Doris' alleged crime or behavior are irrelevant and immaterial to the litigation for any purpose, including (without limitation) resolution of this Motion.  Nor is such character evidence admissible for any purpose at trial and, therefore, may not be properly considered in the context of this Motion.

4.     Watson also attempted suicide several times. (Ex. A at 47–48, 57, 88–89.)

DISPUTED: Plaintiffs dispute DSOF #4 in that the cited testimony does not support the statement of fact.  Chara was read excerpts of medical records of

1  which she had no knowledge.  **Additionally, Chara testified to the one excerpt that**

2  **she did recall, that the hospital thought that it may have been a case of confusion**

3  **over dosing rather than a suicide attempt.  [Def. Ex. A at 89:6-12]**

4  **Furthermore, Chara and Lia have testified that their mother was not**

5  **suicidal, they had never been advised by any healthcare provider that their mother**

6  **had attempted suicide, nor were they concerned that she would hurt herself.  [Ex.**

7  **21, Lia depo. at 47:23-48:12; Ex. 9, Chara depo. at 47:18-48:4; 74:7-75:2]  Doris**

8  **was extremely suggestible during a manic period and could exaggerate physical or**

9  **medical symptoms, be convinced of anything, and/or make statements to**

10  **healthcare providers that were not correct.  [Ex. 21, Lia depo. at 44:20-24; 46:16-**

11  **47:2; Banner T-Bird Hospital progress record, attached hereto as Exhibit 37]**

12  **5.**  In 2007, Watson was a Value Options patient. (Ex. A at 73.)

   **UNDISPUTED.**

13  **6.**  On March 13, 2007, she was 69-years-old. (Autopsy Report, attached as

14  Ex. D.)

15  **DISPUTED:  Doris' date of birth was February 10, 1937.  She was just over**

16  **70 years of age when she died.  [Death Certificate, attached hereto as Exhibit 20]**

17  **7.**  On March 13, 2007, at approximately 1:00 a.m., cab driver Thomas

18  Brown was dispatched to Phoenix Baptist Hospital. (Deposition of Thomas Brown,

19  attached as Ex. E, at 6, 22–23.)

20  **DISPUTED: Plaintiffs dispute DSOF #7 with regard to the time that Mr.**

21  **Brown was dispatched.  The Phoenix Baptist medical records indicate the call for a**

22  **taxi was made at 12:05 a.m. and that Doris was picked up at 12:25 a.m.  [Phoenix**

23  **Baptist Hospital records ("Phx. Baptist records") at PB00008, attached hereto as**

   **Exhibit 3]**

24  **8.**  When he arrived, he saw Watson "fighting with" eight or nine hospital

25  employees. (Ex. E at 7–8; Deposition of Fred Soqui, attached as Ex. F, at 9–11.)

26

DB03/810356.0002/9509092.1 DD02

1
2
3
4
5
6
7
8

**DISPUTED: Plaintiffs dispute DSOF #8 which mischaracterizes the testimony of Mr. Brown and Mr. Soqui.  The cited testimony describes Doris refusing to relinquish a clipboard to hospital employees and not listening to them. [CSSOF ¶ 125]  Doris never hit, or struck out at anyone, she just did not want to give up the clipboard.  [CSSOF ¶¶ 126-127]  Mr. Soqui, the hospital security guard who witnessed the event, thought Doris was a "nice little old lady that was confused, that's all."  [CSSOF ¶ 128]  Mr. Brown, the cab driver, who also witnessed this, felt he could safely take Doris to her destination.  [CSSOF ¶ 129]**

9
10

**9.**     Watson had apparently admitted herself for an asthma attack, and was then discharged. (Ex. A at 90.)

11
12
13
14
15
16
17
18
19
20
21
22

**DISPUTED: Plaintiffs dispute DSOF #9 as misleading and incomplete. Chara was read an excerpt of a Value Options note referencing an asthma attack, of which she had no knowledge.  Doris did not admit herself to Phoenix Baptist Hospital for an asthma attack.  She was brought to Phoenix Baptist Hospital during the morning hours of March 13, 2007 after having reported she was "feeling sad" to Phoenix Fire Department medics.  [Phoenix Fire Department EMS Incident Report, attached hereto as Exhibit 2]  The medics noted her lungs were clear, and equal bilaterally.  [*Id.*]  She was treated and discharged at approximately 11:45 a.m.  [Ex. 3, Phx. Baptist records at PB00021]  Doris was admitted a second time that day to Phoenix Baptist Hospital because she was found wandering the halls having apparently not left from the earlier admission that day. [*Id.* at PB00006-7]  She was again treated and discharged at approximately 11:50 p.m.  [*Id.* at PB00008]**

23
24

**10.**     They were trying to retrieve a clipboard she had taken and refused to give back. (Ex. E at 7–8; Ex. F at 9–11.)

**UNDISPUTED.**

25
26

DB03/810356.0002/9509092.1 DD02

1      **11.**     Watson was "combative" and "throwing elbows." (Ex. E at 7; Ex. F at 14,

2   17.)

3      **DISPUTED: Plaintiffs dispute DSOF #11 which mischaracterizes the**

4   **testimony of Mr. Brown and Mr. Soqui.  The cited testimony describes Doris**

5   **refusing to relinquish a clipboard to hospital employees and not listening to them.**

6   **[CSSOF ¶ 125]  Doris never hit, or struck out at anyone, she just did not want to**

7   **give up the clipboard.  [CSSOF ¶¶ 126-127]  Mr. Soqui, the hospital security guard**

8   **who witnessed the event, thought Doris was a "nice little old lady that was**

9   **confused, that's all."   [CSSOF ¶ 128]   Mr. Brown, the cab driver, who also**

10  **witnessed this, felt he could safely take Doris to her destination.  [CSSOF ¶ 129]**

11     **12.**     The employees eventually secured the clipboard, and escorted Watson

12  into Brown's cab. (Ex. E at 8–9.)

13     **DISPUTED: Plaintiffs dispute DSOF #12 as it does not accurately reflect the**

14  **order of events.  The cited testimony indicated that the hospital employees walked**

15  **Doris through the ER door and toward the cab and that Doris went to a truck**

16  **parked behind the cab and kept knocking on the window waiting for someone to**

    **open the door.  At that point, a hospital employee put her into the cab.**

17     **13.**     As he drove to Watson's apartment, she became even more agitated, and

18  started "pounding [Brown] on [his] shoulder" with her fist, telling him that he "better

19  take her home or she's going to sue [him] personally." (Ex. E at 9–11.)

20     **DISPUTED: Plaintiffs dispute DSOF #13 in that it is incomplete and**

21  **misleading.  Doris sat quietly for the initial 15 minutes of the drive.  [CSSOF ¶ 130]**

22  **Brown recognized that Doris' behavior was very abnormal, especially for an older**

23  **woman, and thought that she seemed to have dementia.  [CSSOF ¶ 131]  Brown**

24  **pulled to the side of the road, requested that his dispatcher call the police for him,**

25  **and waited there for the police to arrive.   [CSSOF ¶ 132]   Doris' agitation**

26  **increased during this time and at one point she struck Brown.  [CSSOF ¶ 133]**

6

**When the officers arrived, Brown described the situation to them and they in turn, called the Fire Department to evaluate Doris.  [CSSOF ¶ 134]   The Fire Department personnel cleared Doris at the scene.  [CSSOF ¶ 135]  Brown felt he could safely take Doris to her destination.  [CSSOF ¶ 129]  Brown continued to drive Doris to the address provided, with the police following behind.  [CSSOF ¶ 136]**

14.     As Brown continued driving, Watson reached forward and pulled Brown's hair "hard," and demanded that he take her home. (Ex. E at 14–16.)

**UNDISPUTED in that this was Mr. Brown's testimony.   There were no witnesses to this incident.**

15.     When Brown arrived at the address he had been given, Watson told him that she did not live there. (Ex. E at 14.)

**UNDISPUTED.**

16.     Brown pulled over, and called police. (Ex. E at 14.)

**DISPUTED: Plaintiffs dispute DSOF #16 in that it incorrectly states the order of events.  The police were already following Brown by this point.  [CSSOF ¶¶ 132, 134-136]**

17.     When Officers approached Watson and asked for her proper address, Watson started fighting with them, kicking one of the officers in the face. (Ex. E at 16–17.)

**DISPUTED: Plaintiffs dispute DSOF #17 in that the cited testimony of Mr. Brown is not corroborated by the responding police officers.   Officers Aaron Albrand and Nathan Faust did not report any assault on them by Doris.  [CSSOF ¶ 141]**

18.     Watson struggled with police for approximately 10 minutes, but, eventually, the officers were able to get her purse and found an alternate address. (Ex. E at 16–18.)

**DISPUTED: Plaintiffs dispute DSOF #18 in that the cited testimony of Mr. Brown is not corroborated by the responding police officers. Officers Aaron Albrand and Nathan Faust did not report any assault on them by Doris. [CSSOF ¶ 141] The Phoenix police officers were able to get Chara's telephone number and the correct address of Doris' home from Police records. They contacted Chara and she agreed to meet them at the correct address. [CSSOF ¶ 138]**

19. Brown agreed to take her to the new address, which was only a block away. (Ex. E at 16–18.)

**DISPUTED: Plaintiffs dispute DSOF #19 with regard only to the distance between locations. The incorrect address was near 7th Street and Bell Rd. The correct address was several miles away near 25th Ave. and Greenway Road [PPD Supplemental Report 21, attached hereto as Exhibit 8]**

20. Watson continued yelling at Brown, and, at one point, she reached forward, grabbed Brown's ear, and "pulled it hard." (Ex. E at 18–19.)

**UNDISPUTED. In that this was Mr. Brown's testimony. There were no other witnesses to this incident. Mr. Brown has also testified that he was not injured or bruised by Doris and he felt comfortable driving her to her home. [Deposition of Thomas Brown ("Brown depo.") at 17:3-25; 40:12-25, attached hereto as Exhibit 4; CSSOF ¶¶ 136, 139]**

21. She also threatened to "kick the hell out of" him. (Ex. E at 23.)

**DISPUTED: Plaintiffs dispute DSOF #21 in that while the cited testimony indicates that Doris may have said words to that effect to Mr. Brown, the testimony does not indicate that Mr. Brown felt in any way threatened. He in fact, felt comfortable with continuing to drive her to her home. [CSSOF ¶¶ 136, 139]**

22. When they arrived, Watson refused to get out of the cab. (Ex. E at 19–20.)

**UNDISPUTED.  Mr. Brown also testified that the officers were nice to Doris, never laid hands on her to try to get her out of the car, and never restrained her or cuffed her.  [CSSOF ¶ 140]**

**23.** Police called Watson's daughter, Chara, who arrived shortly after, and was able to coax her out of the cab. (Ex. A at 100–106; Ex. E at 19–20.)

**DISPUTED. Plaintiffs dispute DSOF #23 in that it incorrectly states the order of events.  The police officers called Chara while they were at the incorrect address.  Chara confirmed Doris' correct address and agreed to meet all of them at the correct address.  [Def. Ex. A at 102; CSSOF ¶ 138]**

**24.** Chara took Watson to her apartment, and contacted the Value Options crisis team. (Ex. A at 112.)

**UNDISPUTED.**

**25.** Chara believed that Watson had stopped taking her medications for at least a week. (Ex. A at 112, 114–115.)

**DISPUTED: Plaintiffs dispute DSOF #25 in that the cited testimony indicates that Chara answered affirmatively to "approximately" a week and indicated her mother was not "properly" taking her medications.  Furthermore, in her interview with Detective Orona, Chara explained that the pills in the bubble packs appeared to have been taken in the morning and afternoon, but not in the evening.  [CSSOF ¶ 121]**

**26.** The crisis team arrived at approximately 4:00 a.m., evaluated Watson, and recommended that she be taken to the emergency room, but Chara elected to keep Watson at home.  (Ex. A at 118–121).

**DISPUTED: Plaintiffs dispute DSOF #26 in that it mischaracterizes the cited testimony and ignores the record of the Value Options Crisis Team.  The Crisis Team members determined that Doris, though confused, was not a danger to herself or others.  [CSSOF ¶ 144]  The Crisis Team members asked Chara what**

9

**she wanted to do: call an ambulance and take her mother to the hospital or let her sleep.  [CSSOF ¶ 145]  The Crisis Team members told Chara that if she went to the hospital she may have to wait hours in the Emergency Department for a room. [CSSOF ¶ 146]  Chara, knowing from past experience, that an emergency room visit frequently resulted in a hospitalization that led to further destabilization of her mother's condition, determined, with the input of the Crisis Team members, that Doris could safely be kept at home until she could be seen the next morning by her Value Options psychiatrist.  [CSSOF ¶ 147]  The Crisis Team members assured Chara that they would have Doris' case manager call Chara first thing in the morning.  [CSSOF ¶ 148]**

27.     Several hours later, at about 7:00 a.m., Watson's Value Options case manager called to follow up on Watson's condition, and scheduled an appointment with a psychiatrist later that morning. (Ex. A at 12 1–124.)

**UNDISPUTED.**

28.     At approximately 10:30 a.m., Watson's temperament began to escalate, and when Chara tried to help her get dressed, Watson became confrontational and violent. (Ex. A at 124–130; Chara Watson-Nance PSB Interview, attached as Ex. H, at 56–62.)

**DISPUTED: Plaintiffs dispute DSOF #28 in that it mischaracterizes the cited testimony in which Chara believed the time to be 9:30-10:00 a.m. and specifically denied that her mother was violent.  [Def. Ex. A at 124:12-15]  Chara described her mother's behavior as being resistant to getting dressed, and assuming a protective stance because she thought Chara was threatening her. [Def. Ex. A at 124:21-125:6]**

29.     Watson assumed a "karate stance" and began wielding a glass cup. (Ex. A at 124–130; Ex. H at 56–62.)

DB03/810356.0002/9509092.1 DD02

**DISPUTED:  Plaintiffs  dispute  DSOF  #29  in  that  it  mischaracterizes  the cited testimony.  Chara describe her mother's behavior as being resistant to getting dressed  and  assuming  a  protective  stance  because  she  thought  that  Chara  was threatening  her.  [Def.  Ex.  A  at  124:21-156:60   Furthermore,  Chara  and  others have testified that Doris never struck Chara with the glass.  [Ex. 9, Chara depo. at 127:6-128:5; Ex. 12, Czekaj depo. at 33:7-15; Ex. 13, Mendez depo. at 62:16-20]**

**30.**     Watson then grabbed Chara's car keys, and insisted that she was going to drive. (Ex. A at 124–130; Ex. H at 56–62.)

**UNDISPUTED.**

**31.**     A  struggle  for  the  keys  then  ensued,  causing  them  both  to  fall  to  the ground. (Ex. A at 124–130; Ex. H at 56–62.)

**UNDISPUTED.**

**32.**     Watson ran out of the apartment into the corridor and began screaming "rape." (Ex. A 130–131; Deposition of Kathleen Czekaj, attached as Ex. I, at 20, 23.)

**UNDISPUTED.**

**33.**     Watson still had the glass in her hand, and appeared ready to "throw it" or "bash" someone with it. (Ex. I at 20–21; Kathleen Czekaj PSB Interview, attached as Ex. J, at 10–11, 15.)

**DISPUTED: Plaintiffs dispute DSOF #33 for all the reasons set forth in their response to DSOF # 29, *supra*.**

**34.**     Watson eventually made her way into the parking lot, and into the driver's seat of Chara's car. (Ex. A at 131–132.)

**UNDISPUTED.**

**35.**     Chara asked Watson to get out of the car, but Watson refused and insisted that she was going to drive. (Ex. A at 13 1–132.)

**UNDISPUTED.**

**36.**     When Chara reached into the car to lure her mother out, Watson grabbed

DB03/810356.0002/9509092.1 DD02

onto Chara's hair with both hands and would not let go. (Ex. A at 131–134.)

**DISPUTED: Plaintiffs dispute DSOF #36 in that the cited testimony indicates Chara was attempting to coax her mother out of the car.**

37.     Chara struggled with Watson in this position for about 5 to 10 minutes, and eventually broke free, but not before Watson pulled out two "handfuls" of Chara's hair, struck Chara's head and eye, and broke Chara's glasses. (Ex. A at 133–134, 148–15 1; Chara Watson-Nance Interview with Officer Buckner, attached as Ex. G, at 3– 4; Ex. H at 60–61, 120; Deposition of Monica Mendez, attached as Ex. K, at 11–16, 19–20.)

**DISPUTED: Plaintiffs dispute DSOF #37 in that Chara has testified that she is uncertain about how her glasses got broken, she was only told by a Value Options provider that her eye was injured and the police told her that she had been hit in the head.  [Ex. 9, Chara depo. 127:15-128:5; 148:19-25]**

38.     Chara retreated to the curb, and called 911. (Ex. A at 137–140, 145– 148; 911 transcript Excerpts, attached as Ex. L.)

**DISPUTED: Plaintiffs dispute DSOF #38 in that Chara did not call 911.  A 911 operator on the telephone with Monica Mendez requested Monica to get Chara on the phone.  [Def. Ex. L at p.12.]**

39.     Chara also contacted Value Options, who said they would dispatch a crisis team. (Ex. L at 15, 18.)

**DISPUTED: Plaintiffs dispute DSOF #39 in that after explaining what had happened with her mother that morning, the 911 operator inquired whether Chara would like to be connected to Value Options.  [Def. Ex. L at p. 14-15]**

40.     Officers Buckner, Gray, and Garcia simultaneously arrived on the scene. (Deposition of John Buckner, attached as Ex. M, at 11–13; Deposition of Brian Gray, attached as Ex. N, at 25; Deposition of Kelli Garcia, attached as Ex. O, at 13.)

**UNDISPUTED.**

**41.**    To their knowledge, they were responding to an "assault in progress, domestic violence" call involving a mother and a daughter, and had been informed that "the mother was hitting the daughter with a glass." (Ex. M at 7, 9–10; Ex. N at 12–13; Ex. O at 7–8, 14.)

**DISPUTED: Plaintiffs dispute DSOF #41 in that the officers also knew before their arrival that Doris was a Value Options patient, had not been taking her psychiatric medications and knew, too, that Value Options dealt with people with mental issues.   [CSSOF ¶ 161]   The officers had been told that the call involved a fight between a mother and daughter and the approximate ages of the women.   [CSSOF ¶ 162]   The officers knew that no weapon was involved.   [CSSOF ¶ 163]**

**42.**    Officers Buckner and Gray were told that the mother was a Value Options patient. (Ex. M at 10; Ex. N at 18; Ex. O at 17–18.)

**DISPUTED:   Plaintiffs dispute DSOF #42 for all the reasons in set forth in their response to DSOF #41, *supra*.**

**43.**    When they arrived, Watson was still sitting in the driver's seat of Chara's car with the door open. (Ex. M at 15–16; Ex. N at 26–27, 33.)

**UNDISPUTED.   Plaintiffs do not dispute that Doris was sitting quietly in the car, saying nothing and making no noise.   [CSSOF ¶ 159]**

**44.**    Her "fists were clinched and her face looked of rage, eyes were wide, wide open." (Ex. M at 16.)

**DISPUTED: Plaintiffs dispute DSOF #44 in that Officer Gray is the only witness who testifies to this.   Monica Mendez testified that prior to the police approach, Doris was sitting quietly in the car, saying nothing and making no noise. [CSSOF ¶ 159]**

**45.**    Officer Gray approached the car, announced himself, and asked Watson "what was going on." (Ex. N at 33, 35–36.)

DB03/810356.0002/9509092.1 DD02

**DISPUTED: Plaintiffs dispute DSOF #45 in that Officer Buckner has testified that neither he, nor Officer Gray spoke to Doris before their encounter with her.  [Ex. 14, Buckner depo. at 19:4-11]**

46.    Watson raised her clenched fists, and responded, "You raped me" and "[A]ll police should die." (Ex. N at 34–36, 167.)

**DISPUTED: Plaintiffs dispute DSOF #46 for the reasons in set forth in their response to DSOF #45, *supra*.  Additionally, Officer Gray is the only witness who testifies to this.**

47.    As Officer Gray got to about 3 feet away, Watson "lunged out of the car towards [him]," and continued walking right past him and towards his patrol car. (Ex. K at 51; Ex. M at 19–20; Ex. N at 34–35, 37, 45.)

**DISPUTED: Plaintiffs dispute DSOF #47 in that Officer Buckner has testified that Doris walked past Officer Gray only a step or two before Gray grabbed one of her arms.  [Ex. 14, Buckner depo. at 19:15-21]   Additionally, Officer Gray has testified that Doris walked past him, without touching him. [CSSOF ¶ 167]**

48.    Officer Gray's patrol car was unlocked, and the keys were in the ignition. (Ex. N at 45, 47.)

**UNDISPUTED.**

49.    Officer Gray turned and followed Watson, but Watson ignored him, continued walking, and grabbed the patrol car's door handle with her right hand. (Ex. N at 45–47.)

**DISPUTED: Plaintiffs dispute DSOF #49 in that Officer Buckner has testified that Doris walked past Officer Gray only a step or two before Gray grabbed one of her arms, and that Doris did not touch Officer Gray's patrol car. [Ex. 14, Buckner depo. at 19:15-21; 20:18-19]**

14

**50.** Concerned for everyone's safety, Officer Gray grabbed her wrist and pulled it away from the car. (Ex. N at 47–48.)

**DISPUTED: Plaintiffs dispute DSOF #50 for the reasons in set forth in their response to DSOF #49, *supra.***

**51.** When he did, Watson "spun around and tried to punch" Officer Gray, and began kicking, biting, and pulling away. (Ex. K at 32–33, 52; Ex. M at 21; Ex. N at 47–49; Ex. O at 33.)

**DISPUTED: Plaintiffs dispute DSOF #51 for the reasons in set forth in their response to DSOF #49, *supra.***

**Additionally, all of the actions Doris is alleged to have done that are described in the cited testimony occurred only after Officer Gray grabbed her wrist. Plaintiffs' psychiatric expert, Dr. Burstein, testified that placing hands on Doris predictably escalated her confusion. [CSSOF ¶ 229]**

**52.** Officer Buckner came to assist and took hold of Watson's left arm, but Watson continued to bite and kick at the officers. (Ex. M at 2 1–22; Ex. N at 49; Ex. O at 30, 32.)

**DISPUTED: Plaintiffs dispute DSOF #52 in that Officer Buckner grabbed Doris' left arm with both of his hands. [CSSOF ¶ 169] Doris did not recognize the officers and was calling for help from the police. [Ex. 9, Chara depo. at 163:12-164:4] Neighbor, Kathleen Czekaj, had recognized that this was not a police matter and called the office management and asked them to call the Value Options Crisis Line. [CSSOF ¶ 155] Ms. Czekaj, herself a Value Options client, knew that Doris was scared and upset and that if police arrived, the incident would surely escalate, especially if the police laid hands on Doris. [CSSOF ¶ 156]**

**Additionally, all of the actions Doris is alleged to have done that are described in the cited testimony occurred only after Officer Gray grabbed her wrist and Officer Buckner grabbed her by the arm. Plaintiffs' psychiatric expert,**

15

Dr. Burstein, testified that placing hands on Doris predictably escalated her confusion.  [CSSOF ¶ 229]

    **53.**    Officer Buckner repeatedly instructed Watson to "calm down," but she refused, and screamed out, "Kill the police. Kill the police. They're raping me." (Ex. K at 33; Ex. M at 22–24.)

    **DISPUTED: Plaintiffs dispute DSOF #53 in that Doris was not intentionally refusing to calm down.   She did not recognize them and was calling for help from the police.  [Ex. 9, Chara depo. at 163:12-164:4]**

    **Neighbor, Kathleen Czekaj, recognized that this was not a police matter and had called the office management and asked them to call the Value Options Crisis Line.  [CSSOF ¶ 155] Ms. Czekaj, herself a Value Options client, knew that Doris was scared and upset and that if police arrived, the incident would surely escalate, especially if the police laid hands on Doris.  [CSSOF ¶ 156]**

    **Additionally, all of the actions Doris is alleged to have done that are described in the cited testimony occurred only after Officer Gray grabbed her wrist and Officer Buckner grabbed her by the arm.  Plaintiffs' psychiatric expert, Dr. Burstein, testified that placing hands on Doris predictably escalated her confusion.  [CSSOF ¶ 229]**

    **54.**    Watson also ignored the officers' commands to submit, and continued to fight them. (Ex. K at 33, 35–36, 54–55.)

    **DISPUTED:  Plaintiffs dispute DSOF #54 in that Doris was not intentionally ignoring the officers' commands.  She did not recognize them and was calling for help from the police.  [Ex. 9, Chara depo. at 163:12-164:4]**

    **Plaintiffs also dispute DSOF #54 for all the reasons in set forth in their response to DSOF #52 and 53, *supra.***

    **55.**    At one point, Officer Gray lost his grip, and Watson went down to the ground onto her buttocks. (Ex. M at 24–28; Ex. N at 49–5 1, 61.)

DB03/810356.0002/9509092.1 DD02

**DISPUTED: Plaintiffs dispute DSOF #55 in that Officer Buckner has testified that there was a decision made to take Doris down and that it was the officers' actions that got her the ground. [Ex. 14, Buckner depo. at 24:1-9; 25:8-15]**

56.     Once on the ground, Watson "rolled back, pulled her knees up to her chest and began kicking at" Officer Gray, striking him. (Ex. M at 28; Ex. N at 52.)

**DISPUTED: Plaintiffs dispute DSOF #56 in that all of the actions Doris is alleged to have done that are described in the cited testimony occurred only after Officer Gray grabbed her wrist and Officer Buckner grabbed her by the arm. Plaintiffs' psychiatric expert, Dr. Burstein, testified that placing hands on Doris predictably escalated her confusion. [CSSOF ¶ 229]**

57.     Officer Gray managed to grab a hold of Watson's right arm again, and the two officers rolled her onto her stomach in order to handcuff her. (Ex. M at 28– 29; Ex. N at 53–54.)

**DISPUTED: Plaintiffs dispute DSOF #57 in that Doris was taken to the ground and forcibly pulled over onto her belly by Officer Buckner, who admits using force to do so. [CSSOF ¶ 171]**

58.     Watson continued to resist, trying to lift up, roll over, and pull her left arm underneath her. (Ex. K at 34–36; Ex. M at 29–3 1, 36–37, 43–44; Ex. N at 55–6 1; Ex. O at 39.)

**DISPUTED: Plaintiffs dispute DSOF #58 in that Buckner lost hold of her left arm, which Doris put under her torso. [CSSOF ¶ 173] Both officers then wrestled her arm out from under Doris and cuffed her behind her back. [CSSOF ¶ 174] While this was going on, Officer Garcia was bent over holding both of Doris' ankles. [CSSOF ¶ 175]**

59.     Officer Buckner placed one hand on the back of Watson's head, his left knee on the ground, and his right knee on Watson's right shoulder blade, applying just enough pressure to prevent her from rolling over. (Ex. K at 34–36; Ex. M at 29–31, 36–

17

37, 43–44; Ex. N at 55–61; Ex. O at 39.)

**DISPUTED: Plaintiffs dispute DSOF #59 in that Buckner then held her head down with his left hand, placed his right knee in her left shoulder blade, making contact with her body, and reached over to get her right arm to cuff her. [CSSOF ¶ 172]  Plaintiffs dispute the amount of pressure placed upon Doris by the officer.  Dr. Spitz points to the bruising on Doris' back as evidence of the degree of compression placed on her primarily by Buckner.  [CSSOF ¶ 207]  The placement of the bruises are consistent with the areas the officers describe making contact with and applying force to Doris.  [CSSOF ¶ 208]  Dr. Spitz explained that based on the size and configuration of the bruising he can determine that it was caused by "an active compressive and fairly consistent force" that would not result from inadvertent force or passive contact.  [CSSOF ¶ 209]**

60.    Once Officer Gray was able to handcuff Watson's right hand, Officer Buckner removed his knee so that they could handcuff her left hand. (Ex. K at 34–36; Ex. M at 29–3 1, 36–37, 43–44; Ex. N at 55–61; Ex. O at 39.)

**UNDISPUTED: Plaintiffs do not dispute that the officers testified that Buckner removed his knee to handcuff Doris.  He did, however, apply compressive force to her head/neck and back continuously until the Fire Dept. arrived. [CSSOF ¶¶ 172, 180, 181, 183, 187, 188]**

61.    He did not place his knee on her back again. (Ex. K at 34–36; Ex. M at 29–3 1, 36–37, 43–44; Ex. N at 55–61; Ex. O at 39.)

**UNDISPUTED   Plaintiffs do not dispute that the officers testified that Buckner did not place his knee in Doris's back after she was cuffed.  He did, however, apply compressive force to her head/neck and back continuously until the Fire Dept. arrived.  [CSSOF ¶¶ 172, 180, 181, 183, 187, 188]**

62.    Officer Gray did not make any further contact with Watson after she was handcuffed. (Ex. N at 83.)

DB03/810356.0002/9509092.1 DD02

**UNDISPUTED.**

**63.**   Once she was cuffed, he stepped away and called the fire department to seek medical attention for Watson. (Ex. N at 79–80.)

**UNDISPUTED:  Plaintiffs do not dispute that Officer Gray called the Fire Department, but he did not step away when he called from his shoulder radio. [Def. Ex. N at 79:24-80:4]   Officer Gray called Fire because he was concerned about Doris' loss of bladder control, her bloody face, her fighting and being taken to the ground.  [Ex. 15, Gray depo. at 77:13-24]   Officer Gray also suggested to Buckner that they sit Doris up.  [CSSOF ¶ 179]**

**64.**   Watson continued to struggle and attempted to get up even after she was handcuffed. (Ex. M at 38–39, 44; Ex. N at 89, 91–92.)

**DISPUTED: Plaintiffs dispute DSOF #64 in that the Officers admit that after she was cuffed, she made no attempt to get up and her movements slowed or stopped – she "mellowed right out" according to Buckner.  [CSSOF ¶ 183] Monica Mendez said that Doris made very few movements after she was cuffed –that she seemed only to be trying to comfort herself, not resist and that she was completely quiet.  [CSSOF ¶ 185]**

**65.**   She continued screaming, "flailing around," "[k]icking her legs, trying to roll over, [and] canting her body." (Ex. M at 3 8–39, 44; Ex. N at 89, 9 1–92.)

**DISPUTED:  Plaintiffs dispute DSOF #65 for all the reasons in set forth in their response to DSOF #64 and DSOF #72, *supra*.**

**66.**   To maintain control of Watson—i.e., prevent her from rolling over, getting up, and assaulting anyone else—Officer Buckner kept one hand on the back of Watson's head and another on the middle of her back, with just enough pressure to keep her from raising her head or rolling over. (Ex. M at 38–40; Ex. N at 85–92; Ex. O at 42–45.)

**DISPUTED: Plaintiffs do not dispute that Officer Buckner kept one hand on**

DB03/810356.0002/9509092.1 DD02

Doris' head and another on the middle of her back.  **Plaintiffs dispute the amount of pressure placed upon Doris by the officer.  Dr. Spitz points to the bruising on Doris' back as evidence of the degree of compression placed on her primarily by Buckner.  [CSSOF ¶ 207]  The placement of the bruises are consistent with the areas the officers describe making contact with and applying force to Doris.  [CSSOF ¶ 208]  Dr. Spitz explained that based on the size and configuration of the bruising he can determine that it was caused by "an active compressive and fairly consistent force" that would not result from inadvertent force or passive contact.  [CSSOF ¶ 209]**

**Furthermore, there was no reason to continue to hold Doris down.  Once the leg irons were applied, Doris made no further movement, nor any noise – she was still.  [CSSOF ¶ 186]  Despite this, Buckner continued to hold her down.  [CSSOF ¶ 187]  Doris was forcibly held down by an officer continuously from the time she was cuffed until the Fire Department arrived.  [CSSOF ¶ 188]**

67.     Officer Garcia, who had been tending to Chara, assisted Officer Buckner and held Watson's ankles with her hands to stop her kicking until ankle restraints could be fastened. (Ex. M at 48–49; Ex. O at 39–40, 45, 49–50.)

**DISPUTED: Plaintiffs dispute DSOF #67 in that Officer Garcia was bent over at the waist holding Doris' ankles down with both of her hands.  [CSSOF ¶ 175]**

68.     While Officer Buckner applied the ankle restraints, Watson continued to move around so Officer Garcia placed her hand on Watson's back with only enough pressure to keep her from moving. (Ex. M at 49; Ex. O at 54–55.)

**DISPUTED: Plaintiffs dispute DSOF #68 in that Officer Garcia did not testify that she used "only enough pressure" to keep Doris from moving.  She did not know how much pressure she applied.  [Ex. 16, Garcia depo. at 55:4-5]  Officer Garcia also testified that Doris was not attempting to get up when Officer Garcia**

bent over and pressed on Doris' shoulders to keep her from moving.  [CSSOF ¶ 182]  In addition, the officers admit that after Doris was cuffed, she made no attempt to get up and her movements slowed or stopped – she "mellowed right out".  [CSSOF ¶ 183]

69.  Officer Buckner then resumed his original position after securing her legs and placed his hands in the same manner until the fire department arrived. (Ex. M at 40, 49–5 1; Ex. O at 60–61.)

DISPUTED: Plaintiffs dispute DSOF #69 in that once the leg irons were applied, Doris made no further movement, nor any noise – she was still.  [CSSOF ¶ 186]  Despite this, Buckner continued to hold her down.  [CSSOF ¶ 187]  Doris was forcibly held down by an officer continuously from the time she was cuffed until the Fire Department arrived.  [CSSOF ¶ 188]

70.  Officer Garcia stood by. (Ex. O at 61.)

UNDISPUTED.

71.  Once the ankle restraints were applied, Watson stopped resisting, but continued jostling around. (Ex. K at 70–72; Ex. M at 50, 61; Ex. O at 53.)

DISPUTED: Plaintiffs dispute DSOF #71 in that the cited testimony does not support the statement of fact.  Ms. Mendez' cited testimony regarding Doris' movement deals with after she was cuffed, not after the leg restraints were placed.  Buckner's cited testimony indicates that after the leg irons were placed there was no more kicking, no more noise, no more movement.  And Garcia's cited testimony indicates that there was no further movement after the leg irons were applied.

72.  Once the leg restraints were secured, Watson rolled on to her right side and canted her left knee up. (Ex. H at 105; Ex. M at 46.)

DISPUTED: Plaintiffs dispute DSOF #72 in that Chara's testimony is the legs were pulled straight when the leg irons were applied.  [Def. Ex. H at 105] Officers Garcia and Gray testified that Doris was on her belly with her legs out

**behind her, not canted.  [Ex. 16, Garcia depo. at 41-42; Ex. 15, Gray depo. at 114-115; CSSOF ¶ 190]**

73.     A towel was placed under Watson's head to keep it off the pavement. (Ex. M at 51; Ex. N at 96; Ex. O at 50–52.)

**UNDISPUTED.**

74.     The fire department arrived shortly thereafter. (Ex. M at 61.)

**DISPUTED: Plaintiffs dispute DSOF #74 in that the cited testimony does not support the statement of fact.  Buckner testified that the Fire Department arrived 4 or 5 minutes after the leg irons were placed.  The dispatch records indicate that approximately 9 minutes passed from the time Gray called until their arrival.  [CSSOF ¶ 189]**

75.     During this time, Officers Buckner and Gray monitored Watson's breathing. (Ex. M at 56, 67, 115; Ex. N at 102; Ex. O at 63–66.)

**DISPUTED: Plaintiffs dispute DSOF #75 in that the cited testimony contradicts one another.  Buchner denied that any of the officers took Doris' pulse before Fire arrived, Gray claimed that he took a pulse and Garcia said that Buckner took a pulse.  Paramedic Bower testified that none of the officers recognized that Doris was a code and in fact denied it, claiming they had tested her and she was "faking."  [CSSOF ¶¶ 191, 192]**

76.     Officer Buckner could feel the rise and fall of her back with his hand, and, at one point, Officer Gray took Watson's pulse to ensure that she was breathing, and was able to find a pulse. (Ex. M at 56, 67, 115; Ex. N at 79, 102; Ex. O at 63–66.)

**DISPUTED: Plaintiffs dispute DSOF #76 for the reasons stated in their response to DSOF #75, *supra*.**

77.     Watson intermittently made noises, and Officer Gray noticed her moving. (Ex. N at 78–79; Ex. O at 53.)

**DISPUTED: Plaintiffs dispute DSOF #77 in that the cited testimony does not support the statement of fact.  Gray's testimony about movement was made regarding the time after the cuffing, not the leg restraints.  Buckner and Garcia testified Doris made no further movement after the leg irons were applied and that she was quiet.  [CSSOF ¶ 186]**

**78.**    Just as fire department personnel arrived, however, Officer Buckner heard Watson give a "deep sigh" and then nothing else. (Ex. M at 65–68.)

**DISPUTED: Plaintiffs dispute DSOF #78 in that neither of the other officers heard this.**

**79.**    He checked her pulse and could not find one. (Ex. M at 65–68.)

**DISPUTED: Plaintiffs dispute DSOF #79 in that Paramedic Bowers said that upon her arrival none of the officers recognized that Doris was a code and none were doing CPR.  [CSSOF ¶¶ 191, 192, 193]**

**80.**    The officers removed Watson's restraints and began cardiopulmonary resuscitation ("CPR"). They also helped retrieve equipment from the ambulance. (Ex. M at 69–70, 73–74; Ex. N at 118.)

**DISPUTED: Plaintiffs dispute DSOF #80 in that Paramedic Bowers testified that she had to instruct the officers to remove the cuffs and that they did so reluctantly.  [CSSOF ¶ 194]**

**81.**    Paramedics on the scene took over the life-saving efforts and transported her to the hospital. (Deposition of Kellie Bowers, attached as Ex. P, at 63, 69– 70.) The Value Options crisis team never arrived. (Ex. O at 134.)

**DISPUTED: Plaintiffs dispute DSOF #81 in that the Value Options crisis team arrived, but Doris had already been taken to the hospital.  [Ex. 38, Terros, Inc. Disposition Form]**

**82.**    Those efforts were unsuccessful, and Watson later died. (Ex. D.)
**UNDISPUTED.**

**83.**    The medical examiner concluded that the cause of death was pre-existing coronary artery disease. (Deposition of John Hu, attached as Ex. Q, at 9–11, 15, 17.)

**DISPUTED: Plaintiffs dispute DSOF #83 in that Dr. Hu testified that a number of other factors contributed to Doris' death, including the psychotic episode, physical exertion and struggle, restraint and prone position.  He is unable to quantify the degree to which each contributed.  [Ex. 26, Hu depo at 31, 38, 51] Dr. Hu concluded that positional asphyxia was a contributing factor in her death. [CSSOF ¶ 210]  He would be unable to testify to a reasonable degree of medical probability that Doris would have died of coronary artery disease that day absent the other contributing factors (psychotic episode, struggle, prone restraint).  [Ex. 26, Hu depo. At 55]**

**84.**    Three of Watson's coronary arteries had substantial blockage—75%, 50%, and 40%—which was exacerbated by her hypertension and high blood pressure. (Ex. A at 109; Ex. Q at 15, 25, 27.)

**DISPUTED: Plaintiffs dispute DSOF #84 in that none of the cited testimony supports the claim that Doris' blockage was exacerbated by hypertension and high blood pressure.  Furthermore, Dr. Hu testified that Doris could have lived another 10 years with that degree of occlusion of her coronary arteries.  [Ex. 26, Hu depo. at 26-27]  See also response to DSOF #83, *supra*.**

**85.**    "Acute psychotic episode with physical exertion and confrontation with others" was listed as a contributing factor. (Ex. Q at 17–18.)

**DISPUTED: Plaintiffs dispute DSOF #85 in that Dr. Hu testified as to a number of other contributing factors to Doris' death.  [CSSOF ¶ 210]; See also response to DSOF #83, *supra*.**

**86.**    Chara and her sister, Lia Shackelford, ("Plaintiffs") filed the instant lawsuit on March 12, 2008. (Complaint, attached as Ex. R.)

**DISPUTED: Plaintiffs dispute DSOF #86 in that the Estate of Doris Watson is also a Plaintiff.**

87.     Plaintiffs raised both state and federal claims against the City of Phoenix, Officers Buckner, Gray, and Garcia, and Chief Jack Harris. (Ex. R.)

**UNDISPUTED.**

88.     The complaint also named the City of Phoenix Police Department, Detective Steve Orona, and Sergeant Theresa Clark as defendants, but the Phoenix Police Department was dismissed by order of this Court as a non-jural entity, and Orona and Clark were dismissed by stipulation of the parties. (Ex. R; Dkt. ## 23, 79, 80).

**UNDISPUTED.**

89.     Plaintiffs' state claims include negligence, gross negligence, intentional infliction of emotional distress, false imprisonment, false arrest, and a violation of A.R.S. § 46–451, et seq., the Adult Protective Services Act ("APSA"). (Ex. R.)

**UNDISPUTED.**

90.     The complaint also included a state claim for negligent infliction of emotional distress, but that claim was previously dismissed by this Court. (Ex. R; Dkt. # 23.)

**UNDISPUTED.**

91.     Plaintiffs' federal claims include excessive force, deliberate indifference to medical needs, unlawful detention, and violation of the right to familial association, in violation of the Fourth, Eighth, and Fourteenth Amendments. (Ex. R.)

**DISPUTED: Plaintiffs dispute DSOF #91 in that they have also asserted federal claims for unconstitutional policies, customs, practices and failure to train.**

92.     The federal claims also allege municipal and supervisorial liability against the City and Chief Harris. (Ex. R.)

**UNDISPUTED.**

**93.**     In Count 4, Plaintiffs allege that the officers used excessive force against Watson by "grabbing her arms, taking her to the concrete ground, forcing her to lie face-down on her stomach, cuffing her arms behind her back, shackling her legs, pressing their knees, hands, and weight into her while doing so." (Ex. R, ¶¶ 60, 117.)

**DISPUTED: Plaintiffs do not dispute that they alleged these specific facts in the cited paragraphs, but this particular fact is incomplete in that Plaintiffs alleged additional facts in those paragraphs and their Fourth Claim also incorporates all of the claims, facts, and allegations set forth in the paragraphs that preceded this Claim.**

**94.**     Chara, Watson's apartment manager, and other bystanders were nearby during the incident. (Ex. K at 28; Ex. M at 63; Ex. N at 63; Ex. O at 66.)

**DISPUTED: Plaintiffs dispute DSOF #94 in that cited testimony does not support the statement of fact: Ms. Mendez was asked only if she was standing nearby during Chara's altercation with Doris ; Buckner testified that a woman he later learned was Chara was nearby after Doris was cuffed, but he doesn't know how long she stayed; Gray testified that Chara was present when he looked up from cuffing Doris; Garcia testified only that there were bystanders when they recognized that Doris had coded.  Chara did not see her mother taken down and handcuffed.  [Ex. 9, Chara depo. at 157-160]  Garcia did not see Buckner and Gray take Doris down.  [Ex. 16, Garcia depo. at 33;18-34:5]  Mendez left before the Fire Department arrived.  [Ex. 13, Mendez depo. at 36:7-19]**

**95.**     When Watson initially stormed out of her apartment wielding the glass, another neighbor had been walking by with her two grandchildren. (Ex. I at 7–9, 12, 20–21.)

**DISPUTED: Plaintiffs dispute DSOF #95 in that the cited testimony does not support the statement of fact.  Ms. Czekaj instead testified that when she first saw Doris she was outside saying "help me, help me."  Chara told her she was**

taking Doris to a doctor's appointment and that Doris was in the state' mental health program.  Ms. Czekaj herself is a Value Options patient and thought that Doris needed to be de-escalated, that this was not a police matter, but needed to be handled by a mental health professional. Her grandchildren were coming and she felt she had to remove her grandkids when she learned the police had been called. She recalled Doris holding a glass. [Def. Ex. I at 7-9, 12, 20-21; CSSOF ¶¶ 154, 155, 156]

**96.**     The officers believed it was necessary to keep a hand on Watson's back until the fire department arrived to prevent her from getting up, hurting herself, and/or hurting anyone else. (Ex. M at 46, 74; Ex. N at 85, 91.)

**DISPUTED: Plaintiffs dispute DSOF #96 in that the officers and others recounted that Doris quieted down after she was cuffed and ceased all movement once the leg irons were placed.  [CSSOF ¶¶ 183, 185, 186]**

**97.**     In Count 4, Plaintiffs further allege that the officers were deliberately indifferent to Watson's medical needs when they "failed to notice" that Watson had stopped breathing and took "no steps to attempt to revive" her. (Ex. R, ¶¶ 61, 117.)

**DISPUTED: Plaintiffs do not dispute that they alleged these specific facts in the cited paragraphs, but this particular fact is incomplete in that Plaintiffs alleged additional facts in those paragraphs and their Fourth Claim also incorporates all of the claims, facts, and allegations set forth in the paragraphs that preceded this Claim.**

**98.**     After Watson was transported to the hospital, Officer Buckner continued with the domestic violence investigation, and interviewed Chara at the apartment complex. (Ex. G; Ex. M at 80–81.)

**DISPUTED: Plaintiffs dispute DSOF #98 in that the "interview" of Chara was a unlawful detention of her, there was no reason to believe she was a suspect. [CSSOF ¶¶ 197, 198]**

**99.** Chara testified at her deposition that she had tried to get into the ambulance to ride to the hospital with Watson, but that Officer Buckner "placed a hand on [her] arm" and told her that she needed to stay and be interviewed. (Ex. A at 169–171.)

**UNDISPUTED.**

**100.** Count 5 of the complaint alleges that this detainment was unlawful under the Fourth Amendment. (Ex. R, ¶ 124.)

**DISPUTED: Plaintiffs do not dispute that they alleged this in the cited paragraph, but this particular fact is incomplete in that Plaintiffs alleged additional facts in that paragraph and their Fifth Claim also incorporates all of the claims, facts, and allegations set forth in the paragraphs that preceded this Claim.**

**101.** The complaint also asserts as a basis for her claim that Chara was forced to give a second interview at the hospital and was prevented from leaving. (Ex. R, ¶ 124.)

**DISPUTED: Plaintiffs do not dispute that they alleged this in the cited paragraph, but this particular fact is incomplete in that Plaintiffs alleged additional facts in that paragraph and their Fifth Claim also incorporates all of the claims, facts, and allegations set forth in the paragraphs that preceded this Claim.**

**102.** That interview was conducted by Detective Steve Orona and Sergeant Theresa Clark as part of their Professional Standards Bureau's investigation. (Ex. H at 1.)

**UNDISPUTED.**

**103.** Upon arriving at the scene, Chara appeared to be one of the individuals involved in the domestic violence call based on her proximity and appearance—she was sitting on the curb crying, and looked "wore out" and "injured," "like someone that's been through a battle." (Ex. M at 78, 82–83; Ex. O at 13–15, 24.)

**DISPUTED: Plaintiffs dispute DSOF #103 in that nothing in Buckner's cited testimony supports any part of this statement of fact.   His description of her looking "wore out" was made after her mother was taken to the hospital.  [Def. Ex. M at 78, 82083]   Officer Garcia's testimony establishes only that she saw Chara sitting on the curb and crying.  [Def. Ex. 0 at 13015, 24]**

104.   The officers also observed blood on Watson's mouth, nose, and hands, and believed that Watson was both a suspect and a victim. (Ex. M at 59–60; Ex. N at 40–42, 149.)

**DISPUTED: Plaintiffs dispute DSOF #104 in that only Gray testified he thought Doris was a victim.  [Def. Ex. N at 149]**

105.   In fact, one witness saw Chara striking Watson in the car. (Deposition of Sharon Conner, attached as Ex. S, at 10, 13.)

**DISPUTED: Plaintiffs dispute DSOF #105 in that Ms. Connor testified that the woman outside the car was hitting the woman inside the car – she was not able to identify that one was Doris and one was Chara.  [Def. Ex. S at 10, 13]  No other witness saw Chara strike Doris.**

106.   The officers did not handcuff Chara, they did not place her in the back of a patrol car, and they did not take her into custody; they simply asked her several pointed questions relating to the event, particularly what had transpired, and then escorted her to the hospital. (Ex. G; Ex. M at 8 1–84; Ex. O at 85.)

**DISPUTED: Plaintiffs dispute DSOF #106 in that the cited testimony of Officer Buckner does not support the statement of fact.  Buckner did unlawfully detain Chara.  [CSSOF ¶¶ 197, 198]**

107.   Throughout the complaint, Plaintiffs allege that Defendants' actions also violated their right to familial association. (Ex. R, ¶¶ 113, 121.)

**DISPUTED: Plaintiffs dispute DSOF #107 in that Plaintiffs alleged in the cited paragraphs that Chara and Lia had been deprived of their constitutional interest in the continued familial companionship and society of their mother.**

108.   To the extent that it can be gleaned from the complaint, Plaintiffs raise two claims against the City in Count 3: (1) implementing policies that condone an indifference to medical conditions, the use of excessive force, and improper restraint; and (2) failure to adequately train its officers regarding the use of force, providing medical care, and restraining individuals. (Ex. R, ¶¶ 100–114.)

**DISPUTED: Plaintiffs do not dispute that they alleged these claims in the cited paragraphs, but this particular fact is incomplete in that Plaintiffs alleged additional facts and claims in those paragraphs and their Third Claim also incorporates all of the claims, facts, and allegations set forth in the paragraphs that preceded this Claim.**

109.   Plaintiffs specifically allege in their complaint that the City did have policies requiring the use of only reasonable force, to ensure prompt medical treatment, and to restrain mentally disturbed individuals with caution, and that officers were trained in these areas. (Ex. R, ¶¶ 62–68.)

**DISPUTED: Plaintiffs do not dispute that they discussed certain City policies in the cited paragraphs, but this particular fact is incomplete in that Plaintiffs alleged additional facts and claims in those paragraphs.**

110.   Plaintiffs further allege in Count 3 that Chief Harris is liable in both his individual and official capacity for the City's policies and training regarding use of force, medical care, and restraining citizens simply because he is a "policy maker" and "ultimately responsible for everything that happens in the City's Police." (Ex. R, ¶¶ 101– 104.)

**DISPUTED: Plaintiffs do not dispute that they discussed Chief Harris' liability in the cited paragraphs, but this particular fact is incomplete in that**

DB03/810356.0002/9509092.1 DD02

**Plaintiffs alleged additional facts and claims in those paragraphs and Plaintiffs' Third Claim also incorporates all of the claims, facts and allegations set forth in the paragraphs that preceded this Claim.**

111.   Counts 1 (negligence) and 2 (gross negligence) allege that the individual officers negligently caused Watson's death by using excessive force, and by failing to provide proper medical care (failing to monitor her medical condition and attempt to revive her). (Ex. R, ¶¶ 72–99.)

**DISPUTED: Plaintiffs do not dispute that they generally made such allegations in the cited paragraphs, but this particular fact is incomplete in that Plaintiffs alleged additional facts and claims in those paragraphs and their First Claim also incorporates all of the claims, facts, and allegations set forth in the paragraphs that preceded this Claim.**

112.   They further allege that the City of Phoenix and Chief Harris negligently trained and supervised the officers, and negligently implemented and/or ratified certain policies relating to the officers' use of force and medical care. (Ex. R, ¶¶ 72–99.)

**DISPUTED: Plaintiffs do not dispute that they generally made such allegations in the cited paragraphs, but this particular fact is incomplete in that Plaintiffs alleged additional facts and claims in those paragraphs and their First and Second Claims also incorporate all of the claims, facts, and allegations set forth in the paragraphs that preceded those Claims.**

113.   In Count 6 of the complaint, Plaintiff Chara alleges that she suffered emotional distress as a result of Defendants' use of force against Watson in her presence, preventing her from accompanying Watson to the hospital, and detaining her for questioning after Watson had died. (Ex. R, ¶ 130.)

**DISPUTED: Plaintiffs do not dispute that they generally made such allegations in the cited paragraph, but this particular fact is incomplete in that Plaintiffs alleged additional facts and claims in that paragraph, including a claim**

31

for Lia, and their Sixth Claim also incorporates all of the claims that preceded this Claim.

**114.**   Plaintiffs Chara and Lia further allege in Count 6 that they suffered emotional distress as a result of not being allowed to spend time alone with Watson in the hospital room after she died. (Ex. R, ¶ 130.)

**DISPUTED: Plaintiffs do not dispute that they generally made such an allegation in the cited paragraph, but this particular fact is incomplete in that Plaintiffs alleged additional facts and claims in that paragraph and their Sixth Claim also incorporates all of the claims that preceded this Claim.**

**115.**   Both Chara and Lia testified that a police officer was in Watson's hospital room at all times. (Ex. A at 174; Ex. O at 9 1–94; Deposition of Lia Shackelford, attached as Ex. T, at 86.)

**UNDISPUTED.**

**116.**   Lia testified that she told the officer that she was going to give Watson a kiss, that the officer told her not to, and that when she proceeded to kiss her the officer pulled her back. (Ex. T at 86–88.)

**DISPUTED: Plaintiffs dispute DSOF #116 in that Lia testified that the officer forcibly pushed her back when she leaned in to kiss her mother.  [CSSOF ¶ 203]**

**117.**   Since Watson was still a suspect (and possibly a victim) in an ongoing investigation, an officer was present with her body to ensure that it was properly preserved and not tampered with. (Ex. O at 9 1–94.)

**DISPUTED: Plaintiffs dispute DSOF #117 in that the cited testimony does not support the statement of fact.  Officer Garcia testified that Doris' body was considered a crime scene only because she died during "a call-police involvement." She said nothing about Doris being a suspect or a victim.  [Def. Ex. O at 91-94]**

118.    In Count 7, Plaintiffs allege that Defendants violated the Adult Protective Services Act ("APSA") because they "had a legal duty to protect and provide care" to Watson and negligently caused her death. (Ex. R, ¶¶ 13 8–139.)

**DISPUTED: Plaintiffs do not dispute that they generally made such allegations in the cited paragraphs, but this particular fact is incomplete in that Plaintiffs alleged additional facts and claims in those paragraph and their Seventh Claim also incorporates all of the claims that preceded this Claim.**

119.    Plaintiffs request punitive damages in connection with their federal constitutional and state tort claims. (Ex. R, ¶¶ 84, 99, 114, 122.)

**DISPUTED: Plaintiffs do not dispute that they have requested punitive damages in connection with certain claims asserted by them, but this particular fact is incomplete in that Plaintiffs alleged additional facts and claims in those cited paragraphs.**

120.    This Court has already dismissed Plaintiffs' claim for punitive damages under APSA. (Dkt. # 23 at 13.)

**UNDISPUTED.**

**SUPPLEMENTAL STATEMENT OF FACTS**

121.    In the days preceding her death, Doris either stopped taking her psychotropic medications regularly or the medications stopped working as well as they had before.  [PSB Interview of Chara Watson-Nance ("PSB Int. Chara") at 44-45, attached hereto as Exhibit 1]

122.    On the morning of March 12, 2007, Doris was taken to Phoenix Baptist Hospital by EMS and was discharged later that morning.  The reason for the visit, she was feeling sad.  [Phoenix Fire Department EMS Incident Report 03/12/2007, attached hereto as Exhibit 2; Phoenix Baptist Hospital medical records ("Phx. Baptist records") at PB00021, attached hereto as Exhibit 3]

DB03/810356.0002/9509092.1 DD02

**123.**   That evening Doris was found still on the premises, was seen again and again discharged.  [Ex. 3, Phx. Baptist records at PB00006-8]

**124.**   Upon discharge the second time, just after midnight, hospital personnel called a taxi for Doris.  [*Id.* at PB00008]

**125.**   When the taxi driver arrived, Doris, in a confused state, did not want to hand over her hospital clipboard to hospital personnel.  [Deposition of Thomas Brown ("Brown depo.") at 27:12-22, attached hereto as Exhibit 4]

**126.**   Doris' "combativeness" consisted of resisting attempts to relinquish the clipboard to the attendants.  [Ex. 4, Brown depo. at 27:23-28:2]

**127.**   Doris never struck anyone nor did she swing her arms as if to strike anyone.  [Ex. 4, Brown depo. at 8:8-11; 28:3-5; Deposition of Fred Soqui ("Soqui depo.") at 16:23-17:5; 17:13-15, attached hereto as Exhibit 5]

**128.**   Fred Soqui, the hospital security guard who witnessed the event, thought Doris was a "nice little old lady that was confused, that's all."  [Ex. 5, Soqui depo. at 18:25-19:6]

**129.**   Brown, the cab driver, who also witnessed this, felt he could safely take Doris to her destination.  [Ex. 4, Brown depo. at 9:7-9; 14:13-16]

**130.**   During the cab ride, Doris, who was silent for the first 15 minutes of the ride, then began acting strangely.  [Ex. 4, Brown depo. at 41:15-42:4]

**131.**   Brown recognized that Doris' behavior was very abnormal, especially for an older woman, and thought that she seemed to have dementia.  [Ex. 4, Brown depo. at 44:10-15]

**132.**   Brown pulled to the side of the road, requested that his dispatcher call the police for him, and waited there for the police to arrive.  [Ex. 4, Brown depo. at 10:13-18]

**133.**   Doris' agitation increased during this time and at one point she struck Brown.  [Ex. 4, Brown depo. at 13:5-14:6]

DB03/810356.0002/9509092.1 DD02

**134.**   When the officers arrived, Brown described the situation to them and they in turn, called the Fire Department to evaluate Doris.  [Ex. 4, Brown depo. at 11:16-13:5; 38:23-39:6]

**135.**   The Fire Department personnel cleared Doris at the scene.  [Ex. 4, Brown 13:15-14:6; Phoenix Fire Department EMS Incident Report 03/13/2007, attached hereto as Exhibit 6]

**136.**   Brown continued to drive Watson to the address provided, with the police following behind.  [Ex. 4, Brown depo. at 14:7-16]

**137.**   Upon arrival at the address Brown was given, Doris rightly said that she did not live there.  [Ex. 4, Brown depo. at 15:16-16:8]

**138.**   The Phoenix police officers were able to get Chara's telephone number and the correct address of Doris' home from Police records.  They contacted Chara and she agreed to meet them at the correct address.  [PPD Supplemental Report 18 ("Supp. Rep. 18"), attached hereto as Exhibit 7; PPD Supplemental Report 21 ("Supp. Rep. 21"), attached hereto as Exhibit 8]

**139.**   Brown agreed to take Doris to her home.  [Ex. 4, Brown depo. at 17:13-17; 41:1-3]

**140.**   During this contact with the Phoenix police, the officers were nice to Doris, never laid hands on her to try to get her out of the car, and never restrained her or cuffed her.  [Ex. 4, Brown depo. at 38:15-22]

**141.**   The Officers did not report any assault on them by Doris.  [Ex. 7, Supp. Rep. 18; Ex. 18, Supp. Rep. 21]

**142.**   Upon arrival at the apartment complex, Chara was able to coax her mother out of the cab and into her home. [Deposition of Chara Watson-Nance (Chara depo.") at 106:7-15, attached hereto as Exhibit 9]

**143.**   Chara called the Value Options Crisis Line and two members of the Crisis Team arrived at approximately 3:30 or 4:00 a.m.  [Ex. 9, Chara depo. at 117:5-11]

DB03/810356.0002/9509092.1 DD02

144.   The Crisis Team members determined that Doris, though confused, was not a danger to herself or others.   [Terros, Inc. medical records ("Terros records"), attached hereto as Exhibit 10]

145.   The Crisis Team members asked Chara what she wanted to do: call an ambulance and take her mother to the hospital or let her sleep.   [Ex. 9, Chara depo. at 119:5-121:9]

146.   The Crisis Team members told Chara that if she went to the hospital she may have to wait hours in the Emergency Department for a room.   [Ex. 9, Chara depo. at 120:19-25]

147.   Chara, knowing from past experience, that an emergency room visit frequently resulted in a hospitalization that led to further destabilization of her mother's condition, determined, with the input of the Crisis Team members, that Doris could safely be kept at home until she could be seen the next morning by her Value Options psychiatrist.   [Ex. 9, Chara depo. at 119:17-120:25; Ex. 10, Terros records]

148.   The Crisis Team members assured Chara that they would have Doris' case manager call Chara first thing in the morning.   [Ex. 9, Chara depo. at 121:1-9]

149.   Once the Crisis Team members left, Doris was quiet, though she did not sleep.   [Ex. 9, Chara depo. at 122:1-123:3]

150.   At approximately 7:00 a.m. Chara received a call from Doris' Value Options case manager, telling her that an appointment had been made for Doris to be seen by her psychiatrist at 11:00 a.m. that morning.   [Ex. 9, Chara depo. at 121:13-17]

151.   Doris was still quiet and calm.   [Ex. 9, Chara depo. at 122:1-123:3]

152.   When Chara encouraged her Mom to get dressed for the appointment, Doris resisted.   A scuffle ensued in the kitchen which soon spilled out into the complex yard.   [Ex. 9, Chara depo. at 129:13-130:12]

153.   Neighbors became concerned and calls were made to the complex office and ultimately 911.   [Deposition of Sharon Conner at 7:17-8:2, attached hereto as

DB03/810356.0002/9509092.1 DD02

Exhibit 11; Deposition of Kathleen Czekaj ("Czekaj depo.") at 7:17-9:15 attached hereto as Exhibit 12; Deposition of Monica Mendez ("Mendez depo.") at 7:25-8:15, attached hereto as Exhibit 13]

**154.** Doris was clearly frightened, fearful, confused and looked "bewildered" to one bystander.  [Ex. 12, Czekaj depo. at 13:21-25; 35:15-36:3; 36:7-15]

**155.** Recognizing that this was not a police matter, Kathleen Czekaj, a neighbor, called the office management and asked them to call the Value Options Crisis Line.  [Ex. 12, Czekaj depo. at 9:17-21]

**156.** Ms. Czekaj, herself a Value Options client, knew that Doris was scared and upset and that if police arrived, the incident would surely escalate, especially if the police laid hands on Doris.  [Ex. 12, Czekaj depo. at 25:7-16; 28:1-6; 28:23-29:1]

**157.** Doris then got into the driver's seat of Chara's car, barefoot and in her pajamas, and refused to move to the passenger seat.  When Chara bent in to hand her cell phone to her mother to speak to Value Options, Doris grabbed Chara's hair and wouldn't let go.  [Ex. 9, Chara depo. at 131:1-132:10]

**158.** When Chara was able to free herself, she backed off and sat on a curb in the parking area.  [Ex. 9, Chara depo. at 135:14-16]

**159.** Meanwhile, Doris was sitting quietly in Chara's car, saying nothing and making no noise.  [Ex. 13, Mendez depo. at 51:1-16]

**160.** Approximately five minutes later, the police arrived: three officers in separate cars.  [Ex. 9, Chara depo. at 137:24-138:2; 153:15-22]

**161.** The officers knew before their arrival that Doris was a Value Options patient, had not been taking her psychiatric medications and knew, too, that Value Options dealt with people with mental issues.  [Deposition of John Buckner ("Buckner depo.") at 10:2-17, attached hereto as Exhibit 14; Deposition of Brian Gray at 18:7-11 ("Gray depo."), attached hereto as Exhibit 15]

162.    The officers had been told that the call involved a fight between a mother and daughter and the approximate ages of the women.  [Ex. 14, Buckner depo. at 7:17-23; Ex. 15, Gray depo. at 13:3-8; Deposition of Kerri Garcia ("Garcia depo.") at 7:18-8:16, attached hereto as Exhibit 16]

163.    The officers knew that no weapon was involved.  [Ex. 14, Buckner depo. at 9:14-15]

164.    Officer Gray, 225 pounds, first approached Doris as she sat quietly in Chara's car.  [Ex. 15, Gray depo. at 26:11-17, 166:9-11; Ex. 13, Mendez depo. at 51:1-16]

165.    When Gray was just feet from Doris, she exited the car quickly, accusing him of raping her.  [Ex. 15, Gray depo. at 34:4-18]

166.    Officer Gray could see that Doris was an older woman, in pajamas, with blood on her mouth and nose, disheveled, showing signs of impairment and that her eyes were bloodshot, glassy and watery.  [Ex. 15, Gray depo. at 41:11-43:2]

167.    Doris walked past Gray, never touching him.  [Ex. 15, Gray depo. at 45:2-46:4]

168.    Believing that Doris was going to get into his squad car, Gray grabbed her right wrist and pulled her away from the car.  [Ex. 15, Gray depo. at 47:9-48:10]

169.    At that point, Officer Buckner, 250 pounds, then grabbed Doris' left arm with both hands.  [Ex. 14, Buckner depo. at 21:23-22:2; 34:18-22]

170.    Doris, obviously confused and terrified, began screaming and Buckner told Gray that they would have to take her down.  [Ex. 14, Buckner depo. at 24:1-7]

171.    Doris was taken to the ground and forcibly pulled over onto her belly by Officer Buckner, who admits using force to do so.  [Ex. 14, Buckner depo. at 29; 36:7-23]

**172.** Buckner then held her head down with his left hand, placed his right knee in her left shoulder blade, making contact with her body, and reached over to get her right arm to cuff her.  [Ex. 14, Buckner depo. at 28:21-29:18; 31:15-18]

**173.** Buckner lost hold of her left arm, which Doris put under her torso.  [Ex. 14, Buckner depo. at 29:10-25]

**174.** Both officers then wrestled her arm out from under this confused and mentally unstable older woman and cuffed her behind her back.  [Ex. 14, Buckner depo. at 30:1-31:6]

**175.** While this was going on, Officer Garcia was bent over holding both of Doris' ankles.  [Ex. 16, Garcia depo. at 39:21-40:4]

**176.** At this point, Doris was prone and cuffed lying on the asphalt of the parking lot.  [Ex. 14, Buckner depo. at 31:3-6]

**177.** Doris urinated when she was on her belly being cuffed.  [Ex. 15, Gray depo. at 71:21-72:3; Ex. 16, Garcia depo. at 52:8-14]

**178.** Once the cuffs were on, Officer Gray called the Fire Department.  [Ex. 15, Gray depo. at 77:22-24]

**179.** Gray also suggested to Buckner that they sit Doris up.  [Ex. 15, Gray depo. at 93:9-94:18]

**180.** Officer Buckner refused and continued to hold her head down with his left hand so that she could not raise it and at the same time, Buckner had his left hand in her back to make sure that she did not roll over [Ex. 14, Buckner depo. at 38:6-14, 40:4-6; Ex. 15, Gray depo. at 94:15-95:3]

**181.** Buckner had hands-on contact with Doris from the time she was cuffed until the Fire Department arrived except for the few minutes it took him to retrieve his leg irons in his car.  [Ex. 14, Buckner depo. at 40:15-20]

DB03/810356.0002/9509092.1 DD02

**182.**   When Buckner went to his car, Officer Garcia bent over and pressed on Doris' shoulders to keep her from moving, though Doris made no attempt to get up. [Ex. 16, Garcia depo. at 54:16-56:15]

**183.**   The officers continued to hold Doris down, they admit that after she was cuffed, she made no attempt to get up and her movements slowed or stopped – she "mellowed right out" according to Buckner.  [Ex. 16, Garcia depo. at 56:22-57:1, Ex. 14, Buckner depo. at 45:2-11]

**184.**   Despite this, the officers placed Doris in leg irons a few minutes after cuffing her.  [Ex. 14, Buckner depo. at 49:3-5]

**185.**   Buckner claimed that Doris was kicking her legs up at the knee (she remained on her stomach) though other witnesses said that Doris made very few movements after she was cuffed –that she seemed only to be trying to comfort herself, not resist and that she was completely quiet.  [Ex. 13, Mendez depo. at 71:1-8]

**186.**   Once the leg irons were applied, Doris made no further movement, nor any noise – she was still.  [Ex. 14, Buckner depo. at 50:7-9, 60:24-61:8; Ex. 16, Garcia depo. at 52:2-7]

**187.**   Despite this, Buckner continued to hold her down.  [Ex. 16, Garcia depo. at 60:13-61:5]

**188.**   Doris was forcibly held down by an officer continuously from the time she was cuffed until the Fire Department arrived.  [Ex. 14, Buckner depo. at 54:17-22]

**189.**   The Fire Department arrived approximately 9 minutes after Gray placed the call.  [Phx. Fire Dept. Incident History Report, attached hereto as Exhibit 17]

**190.**   As the paramedics were approaching the scene, medic Kellie Bowers noted that Doris was laying flat on her stomach, with her legs straight out behind her and cuffed behind her back.  [Deposition of Kellie Bowers ("Bowers depo.") at 30:12-32:16, attached hereto as Exhibit 18]

**191.** While Buckner and Gray now claim that they noticed Doris was not breathing just before or just as Fire was arriving, Ms. Bowers tells a different story. Her initial impression was that Doris was a code, but no one was doing CPR. [Ex. 18, Bowers depo. at 43:21-44:16; Ex. 14, Buckner depo. at 69:15-71:4]

**192.** When Bowers asked if Doris was a code, one of the male officers said: "No, she's faking" and indicated that they had "tested" her eye to determine if she was faking. [Ex. 18, Bowers depo. at 33:8-36:10]

**193.** Bowers was bothered that the officers had not recognized that Doris was a code. [Ex. 18, Bowers depo. at 43:11-44:11; 47:19-49:24]

**194.** When Bowers found Doris to be unresponsive and asked the officers to remove the cuffs, which they were reluctant to do. [Ex. 18, Bowers depo. at 37:17-38:3]

**195.** The officers told Bowers that Doris had been quiet since about a minute after they cuffed her. [Ex. 18, Bowers depo. at 50:15-51:8]

**196.** Resuscitation was attempted, but was unsuccessful. Doris was taken to John C. Lincoln Hospital where she was pronounced dead at 11:54 a.m. [Code Arrest Form, attached hereto as Exhibit 19; Death Certificate, attached hereto as Exhibit 20]

**197.** Chara tried to get in the ambulance with her Mom, but Buckner grabbed her by the arm and physically prevented her from doing so. [Ex. 9, Chara depo. at 170:11-171:2; Ex. 14, Buckner depo. at 86:21-87:2]

**198.** Buckner then proceeded to tape record an interview with Chara for 22 minutes about the events of the morning – despite the fact that Chara had just witnessed CPR being performed on her Mom and was terribly concerned for her well-being. [Ex. 14, Buckner depo. at 81:23-82:1; Ex. 9, Chara depo. at 171:3-172:3]

**199.** Once she was finally allowed to go to the hospital, Chara learned that her mother had died. [Ex. 9, Chara depo. at 173:4-12]

**200.** Soon after, her sister, Lia, arrived at the hospital. [Ex. 9, Chara depo. at 174:16-22]

**201.** Chara and Lia were not allowed to enter the room with their Mom for another three hours. [Deposition of Lia Shackelford ("Lia depo.") at 86:1-5, attached hereto as Exhibit 21]

**202.** Even then, Lia and Chara were not allowed to be alone with their mother – officers told them that her body was a "crime scene." [Ex. 21, Lia depo. at 86:6-19; Ex. 16, Garcia depo. at 91:14-92:4; PPD Supplemental Report 27, attached hereto as Exhibit 22]

**203.** They were forbidden to touch their Mom and when Lia leaned in to kiss her mother good bye, an officer adamantly and forcefully pushed her back. [Ex. 21, Lia depo. at 86:20-88:24; PPD Supplemental Report 25 ("Supp. Rep. 25"), attached hereto as Exhibit 23]

**204.** They were soon asked to leave the room. [Ex. 23, Supp. Rep. 25]

**205.** Not long after this, Chara was pulled into a room with two Phoenix police detectives and interviewed for 3 hours, while her mother lay dead just doors away. [Ex. 21, Lia depo. at 91:4-92:1]

**206.** Dr. Daniel Spitz, Plaintiffs' causation expert and a board-certified forensic pathologist, concluded that Doris died as a result of restraint asphyxia with compression. [Expert report of Daniel J. Spitz, M.D. ("Spitz Report") at p. 3, attached hereto as Exhibit 24]

**207.** Dr. Spitz points to the bruising on Doris' back as evidence of the degree of compression placed on her primarily by Buckner. [Ex. 24, Spitz Report at p. 3; Deposition of Daniel Spitz, M.D. ("Spitz depo.") at 38:17-39:4, attached hereto as Exhibit 25]

208.   The placement of the bruises is consistent with the areas the officers describe making contact with and applying force to Doris.  [Ex. 25, Spitz depo. at 37:8-39:4]

209.   Dr. Spitz explained that based on the size and configuration of the bruising he can determine that it was caused by "an active compressive and fairly consistent force" that would not result from inadvertent force or passive contact.  [Ex. 25, Spitz depo. at 39:5-13]

210.   Dr. Hu, the medical examiner who did the autopsy on Doris and who Defendants rely on for cause of death testimony, also concluded that positional asphyxia was a contributing factor in Doris' death.  [Deposition of John Hu, M.D. ("Hu depo.") at 34:19-23; 37:18-22; 49:1-5, attached hereto as Exhibit 26]

211.   Dr. Hu agreed, too, that the bruising on Doris' back could have been caused by the officers applying force.  [Ex. 26, Hu depo. at 55:3-14]

212.   Plaintiffs' police practices expert, D.P. Van Blaricom testified that the deadly risk of restraint asphyxia has long been documented by authoritative law enforcement sources of information (Expert report of D.P. Van Blaricom ("Van Blaricom report") at p.3, attached hereto as Exhibit 27).

213.   Mr. Van Blaricom testified that the officers used excessive force on Doris, they failed to comply with their training, forcibly held her down in a position they were trained not to place her in and refused to sit her up or roll her to her side after restraining her.  [Deposition of D.P. Van Blaricom ("Van Blaricom depo.") at 49:3-50:7, attached hereto as Exhibit 28]

214.   Mr. Van Blaricom believes that all three of the officers are liable for this excessive use of force because they either exerted it, or failed to effectively intervene to stop it.  [Ex. 28, Van Blaricom depo. at 49:11-14]

215. Gray, who realized that Doris should be sat up after she was cuffed and suggested it to Buckner, failed to insist when Buckner refused. [Ex. 28, Van Blaricom depo. at 49:15-22]

216. Mr. Van Blaricon believes, too, that the officers failed to adequately monitor her after she was restrained, failed to notice she had stopped breathing, and failed to timely start CPR. [Ex. 28, Van Blaricom depo. at 62:18-65:1 ; 73:19-74:3]

217. Mr. Van Blaricom opined that this was clearly a medical situation and that Fire should have been notified even before restraining Doris. [Ex. 28, Van Blaricom depo. at 78:1-25]

218. Mr. Van Blaricom believed, too, that the City of Phoenix police policymakers ratified the conduct of these officers by failing to find their conduct out of policy in the reviews done of the incident. [Ex. 28, Van Blaricom depo. at 83:3-24]

219. All of the officers involved in Doris' death received training from the City of Phoenix Police Department on Sudden In Custody Death Syndrome/ Positional Asphyxia. [Ex. 27, Van Blaricom report, at p.7; Ex. 28, Van Blaricom depo. at 62:18-65:1; PPD Academy Training Record for John Buckner ("Buckner training") at p. 5, attached hereto as Exhibit 29; PPD Academy Training Record for Kerri Garcia ("Garcia training") at p.5, attached hereto as Exhibit 30; PPD Academy Training Record for Brian Gray ("Gray training") at p.4, attached hereto as Exhibit 31]

220. Doris was exhibiting at least 10 of the 32 warning signs associated with sudden in custody death [Ex. 28, Van Blaricom depo. at 80:23-82:12]

221. That training taught officers to avoid placing restrained suspects prone and to sit them up after restraint as soon as possible, recognizing that the prone position, particularly under certain circumstances, can impair respiration and lead to restraint death. [Restraint Systems and Positional Asphyxia Lesson Plan ("Restraint Lesson Plan") at pp. 8, 11, attached hereto as Exhibit 32]

222.     That same training emphasizes that any force to the back when a suspect is prone must be minimized.  [Exhibit 32, Restraint Lesson Plan at p. 8, 11]

223.     Phoenix police officers are required to receive CPR training and be certified every two years.  [Ex. 14, Buckner depo. at 99:24-100:1, Ex. 15, Gray depo. at 176:19-24; Ex. 16, Garcia depo. at 125:13-21]

224.     The Phoenix Police Department expects officers to begin CPR in the field if someone has coded and medical help is not available.  [Ex. 14, Buckner depo. at 99:24-100:4; Ex. 16, Garcia depo. at 142:24-143:4; Ex. 15, Gray depo. at 178:7-11; Ex. 32, Restraint Lesson Plan at p. 9]

225.     The officers had been given the dispatch information about Doris which, combined with their observation of her behavior, alerted them to the fact that this was a medical, not a criminal, situation.  [Ex. 28, Van Blaricom depo. at 78:1-11]

226.     The officers recognized that Doris' behavior was irrational, she was impaired, and having some type of psychiatric episode.  [Ex. 16, Garcia depo. at 141:11-13; Ex. 15, Gray depo. at 42:14-18; Ex. 14; Buckner depo. at 22:25-23:10]

227.     The officers knew she was unarmed [Ex. 16, Garcia depo. at 14:16-18; Ex. 14, Buckner depo. at 9:14-15, 101:9-11]

228.     Doris could no longer objectively be considered a genuine threat to anyone at that time.  [Ex. 16, Garcia depo. at 131:12-133:9; Ex. 15, Gray depo. at 84:8-19]

229.     Plaintiffs' psychiatric expert, Dr. Burstein, testified that placing hands on Doris predictably escalated her confusion.   [Deposition of Alvin Burstein, M.D. ("Burstein depo.") at 151:10-152:13, attached hereto as Exhibit 33]

230.     Any alleged assault on the officers occurred only after they laid hands on her, an action she could not properly interpret in her confused and delusional state.  [Ex. 33, Burstein depo. at 150:15-151:9]

DB03/810356.0002/9509092.1 DD02

231.    Doris was a strong candidate for sudden in-custody death from positional asphyxia.  She met at least 10 of the indicators set forth in the Phoenix Police guidelines for making this determination.  [Ex. 28, Van Blaricom depo. at 79:16-80:5, 81:3-23; Ex. 32, Restraint Lesson Plan at pp. 3-5, 11]

232.    Buckner testified he would not have let Chara leave before interviewing her.  [Ex. 14, Buckner depo. at 86:21-87:6]

233.    Plaintiffs' police practices expert testified that the City's training instructs officers not to leave restrained suspects prone, but to place them on their side or in a seated position and to minimize any force on their back [Ex. 28, Van Blaricom depo. at 54:19-58:19]

234.    This same training requires officers to monitor the breathing of the suspect.  [Ex. 32, Restraint Lesson Plan, p. 8]

235.    All the involved officers received this training.  [Ex. 27, Van Blaricom Report, p. 7-8; Ex. 29, Buckner training at p. 5; Ex. 30, Garcia training at p. 5; Ex. 31, Gray training at p. 4]

236.    After Doris' death, the Phoenix Police Department started training its officers that positional asphyxia "does not exist" and that sudden in-custody deaths under circumstances like Doris' are caused by excited delirium [Deposition of Timothy Woods at 56:9-17, 61:3-19, attached hereto as Exhibit 34, Excited Delirium Lesson Plan,  attached hereto as Exhibit 35]

237.    Dr. Hu testified Doris did not die of excited delirium  [Ex. 26, Hu depo. at 77:6-10]

238.    Chief Harris ratified the unconstitutional actions of the officers in this case by the fact that they were cleared in all investigations done after this incident. [Ex. 27, Van Blaricon report, pp. 10-11]

DB03/810356.0002/9509092.1 DD02

DATED this 17th day of September, 2010.

**STINSON MORRISON HECKER** LLP

By:     s/ Leslie E. O'Hara

Michael C. Manning
Leslie E. O'Hara
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2010, I caused the foregoing document to be filed electronically with the Clerk of Court through ECF; and that ECF will send an e-notice of the electronic filing to:

The following ECF participants:

Kathleen L. Wieneke
Christina Retts
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
*Attorney for Defendants*

By:   s/ Kathleen Kaupke

47

DB03/810356.0002/9509092.1 DD02